744 N.W.2d 880 (2007)
2008 WI App 6
Gregory PHELPS, Marlene L. Phelps, Estate of Adam Phelps, Deceased, by his Special Administrator, Gregory G. Phelps, Caroline Phelps and Kyle Phelps, minors, by their Guardian ad Litem, William M. Cannon, Plaintiffs-Respondents-Cross-Appellants
v.
PHYSICIANS INSURANCE CO. OF WISCONSIN, INC., a Wisconsin insurance corporation, Matthew Lindemann, M.D., Defendants-Appellants-Cross-Respondents.[]
No. 2006AP2599.
Court of Appeals of Wisconsin.
Oral Argument October 3, 2007.
Opinion Filed December 4, 2007.
*881 On behalf of the defendants-appellants-cross-respondents, the cause was submitted on the briefs of Michael B. Van Sicklen, Mark L. Langenfeld, and Matthew D. Lee of Foley & Lardner, LLP, of Milwaukee, with oral argument by Michael B. Van Sicklen.
On behalf of the plaintiffs-respondents-cross-appellants, the cause was submitted on the briefs of William M. Cannon, Sarah F. Kaas and Edward E. Robinson of Cannon & Dunphy, S.C., of Brookfield, with oral argument by William M. Cannon.
Before CURLEY, P.J., WEDEMEYER and FINE, JJ.
¶ 1 CURLEY, P.J.
Physicians Insurance Company of Wisconsin, Inc. and Matthew Lindemann, M.D. (collectively referred to as PIC), appeal the trial court's order reinstating the $200,000 award to Gregory Phelps (Gregory) for his emotional distress and permanent injuries caused as a result of witnessing the birth of his son, Adam, who died due to the negligence of Dr. Lindemann and St. Joseph's Hospital, as determined in a bench trial.[1] Gregory, Marlene, Caroline, *882 Adam's estate and Kyle Phelps cross-appeal the trial court's order finding that Dr. Lindemann was a "borrowed employee" of St. Joseph's Hospital. Because Dr. Lindemann was not a "borrowed employee" and the award for emotional distress was properly reinstated because the caps on damages contained in WIS. STAT. ch. 655 (1997-98) do not cover Dr. Lindemann's negligence, we affirm the reinstatement of emotional distress damages and reverse the ruling that Dr. Lindemann is a "borrowed employee."[2]

I. BACKGROUND.
¶ 2 This appeal follows a remand from the supreme court to the trial court. The relevant facts found in the supreme court decision are set forth in this opinion. See Phelps v. Physicians Ins. Co. of Wis., 2005 WI 85, ¶¶ 5-13, 282 Wis.2d 69, 698 N.W.2d 643 (Phelps II).
¶ 3 Marlene Phelps (Marlene) discovered that she was pregnant with twins in June 1998. Soon thereafter, she started bleeding and was successfully treated at St. Joseph's Hospital in Milwaukee. After that episode, she was placed on strict home bed rest.
¶ 4 Marlene's pregnancy progressed without incident until October 18, 1998, when another bleeding episode occurred. She was admitted to St. Joseph's Hospital and continued her program of bed rest. Two days later, an ultrasound revealed that one of the twins was a breech presentation (legs first). Based on this finding, Marlene was deemed a high-risk patient who required a c-section for delivery of the twins.
¶ 5 In the early morning of November 24, 1998, Marlene was awakened with constant suprapubic pain. The on-call resident, Dr. Matthew Lindemann, was contacted. Dr. Lindemann was an unlicensed first-year resident and, according to the trial court's findings of facts, was an employee of the Medical College of Wisconsin Affiliated Hospital (MCWAH). His primary duty was to assess and report findings and differential diagnoses to an upper-level senior resident or to the attending obstetrician. He had no authority, however, to provide primary obstetrical care or perform a c-section on Marlene.
¶ 6 Dr. Lindemann ordered lactated ringers to be administered at 2:40 a.m. for suspected contractions. They did not alleviate Marlene's pain. At 3:00 a.m., Dr. Lindemann reached a differential diagnosis of pubic symphysis pain, bladder pain, labor or placental abruption. Accordingly, he ordered a foley catheter to determine if Marlene had a bladder infection. The urinalysis returned at 3:50 a.m. indicated that she did not.
¶ 7 Due to the continued pain she was experiencing, Marlene requested at 4:15 a.m. that the attending nurse call Dr. Lindemann again. Fetal heart monitoring and an ultrasound established that the twins' heart rates were within normal ranges. Dr. Lindemann informed Marlene that he would take a picture of the ultrasound *883 so that he could consult with an upper-level senior resident.
¶ 8 After this examination, Dr. Lindemann ordered a potent narcotic, Demerol, to be administered to Marlene at 4:50 a.m. and 5:20 a.m. Dr. Lindemann never satisfactorily explained his whereabouts between 4:15 a.m. and 6:00 a.m. However, there is no evidence that he ever contacted an upper-level senior resident to discuss Marlene's case.
¶ 9 Marlene remained in pain when Dr. Lindemann examined her again at 6:00 a.m. At 6:45 a.m., her husband Gregory arrived, at the hospital. Marlene informed Gregory that she felt the need to defecate and asked for assistance to get to the commode. At 7:00 a.m., while sitting on the commode, she reached down and felt toes extending from her.
¶ 10 Her husband rushed to the nurses' desk where he found another doctor, who delivered Adam Phelps (Adam) at 7:20 a.m. Adam was immediately rushed to the neonatal intensive care unit where resuscitation efforts began. The efforts proved unsuccessful, and he was pronounced dead at 7:36 a.m. Adam's death was caused from a combination of asphyxia due to cord entrapment and placental abruption, which impaired his oxygen supply.
¶ 11 During this time, Marlene was rushed from her room to the operating room whore anesthesia was administered at 7:30 a.m. The second twin, Kyle, was delivered at 7:43 a.m. Afterward, the treating physicians questioned Dr. Lindemann about his decisions, his whereabouts and his diagnosis. Dr. Lindemann's responses were primarily that he did not know or remember.
¶ 12 Marlene, Gregory and their two surviving children (the Phelpses) filed suit against Dr. Lindemann and his insurer, PIC. PIC filed an answer and demanded a jury trial. PIC, however, failed to pay the jury fee within the time required by the scheduling order. PIC sought to enlarge the time to pay the jury fee. The Phelpses opposed PIC's motion. The trial court refused to extend the time for the payment of the jury fees and the trial court held a bench trial.
¶ 13 At the conclusion of the lengthy trial, the trial court found that Dr. Lindemann and St. Joseph's Hospital were both causally negligent. Prior to trial, the trial court explained that because Dr. Lindemann was a first-year resident and unlicensed to practice medicine, he did not fall within the definition of a physician found in WIS. STAT. § 655.001(10m),[3] and he was not entitled to the protection of chapter 655 of the statutes. As noted by this court in an earlier appeal, "The legislature has unambiguously declared that the cap on noneconomic damages in WIS. STAT. § 893.55(4)(b) applies only to those who are health-care providers under WIS. STAT. ch. 655, and to `employees of health care providers' as the phrase is further limited by § 893.55(4)(b)." Phelps v. Physicians Ins. Co. of Wis., 2004 WI App 91, ¶ 45, 273 Wis.2d 667, 681 N.W.2d 571 (Phelps I), rev'd on other grounds by Phelps II, 282 Wis.2d 69, 698 N.W.2d 643.
¶ 14 The trial court concluded that Dr. Lindemann was negligent in his care and treatment of Marlene and Adam under both the standard of care applicable to a first-year resident and the standard of care of a practicing physician. Specifically, as a first-year resident, the trial court found that his actions fell below the standard *884 of care of a first-year resident because he failed to contact an upper-level senior resident or the attending physician concerning Marlene's and Adam's care.[4] The trial court also found that St. Joseph's was negligent in its implementation of the residency program. The trial court divided the negligence and assessed Dr. Lindemann 80% negligent and St. Joseph's 20% negligent
¶ 15 As a result of the trial court's findings, the court awarded Gregory and Marlene $500,000 for the wrongful death of Adam. It awarded the surviving children, Caroline and Kyle, $45,000 each for their loss of society and companionship of their mother until age eighteen. As relevant to this appeal, the trial court awarded $200,000 each to Gregory and Marlene for their emotional distress and permanent injuries.[5]
¶ 16 Following the trial, PIC appealed and this court reversed the trial court's decision to refuse to permit the late payment of the jury fee and remanded the matter to the trial court for a new trial. Phelps I, 273 Wis.2d 667, ¶ 2, 681 N.W.2d 571. Following this court's decision, the supreme court granted both the Phelpses' and PIC's petitions for review. Eventually the supreme court reversed this court, reinstating the trial court's decision. Phelps II, 282 Wis.2d 69, ¶ 4, 698 N.W.2d 643. However, the supreme court remanded the matter to the trial court to determine whether Dr. Lindemann was a "borrowed employee" of St. Joseph's Hospital. Id. The supreme court observed that, "[i]n doing so, we are mindful that this may ultimately be dispositive of our discussion of the cap on noneconomic damages." Id., ¶ 4 n. 4. If Dr. Lindemann was a "borrowed employee" of St. Joseph's Hospital, he would then fall within the statutory protection of WIS. STAT. ch. 655, which provides a compensation fund for victims of medical malpractice and caps the recoverable amount of damages that can be awarded to victims of medical malpractice.
¶ 17 After the matter was remanded to the trial court, the parties stipulated that the trial court could make its determination as to whether Dr. Lindemann was a "borrowed employee" on the basis of the existing record and no additional testimony was taken. The issue was extensively briefed. Ultimately, the trial court (a different judge than the one who heard the trial) determined that Dr. Lindemann was a "borrowed employee" of St. Joseph's Hospital. The Phelpses filed a motion for reconsideration, which the court denied. The Phelpses appeal that determination.
¶ 18 The trial court issued a decision setting forth how the damages awarded by the original trial court were affected by application of the "borrowed employee" doctrine. The trial court noted that the , legal landscape had changed since the trial, due to the pronouncements in several new supreme court cases, and stated: "I conclude that the statutory limitation on noneconomic damages applies only to the damages awarded to Marlene and Gregory Phelps for wrongful death and to Gregory Phelps for emotional distress. The other damages awarded to Marlene, Caroline *885 and Kyle Phelps are not subject to this limitation." The trial court then determined that Gregory's emotional distress damage claim was barred.
¶ 19 The trial court claimed that Maurin v. Hall, 2004 WI 100, 274 Wis.2d 28, 682 N.W.2d 866, dictated such a conclusion. The holding in the case held that, pursuant to WIS. STAT. § 895.04(4) (1995-96), when a patient of a health care provider who commits medical malpractice dies, the cap for wrongful death actions limits: all noneconomic damages. Maurin, 274 Wis.2d 28, ¶ 6, 682 N.W.2d 866. However, shortly thereafter, the supreme court decided Bar.: tholomew v. Wisconsin Patients Compensation Fund, 2006 WI 91, ¶ 16, 293 Wis.2d 38, 717 N.W.2d 216, which expressly overruled Maurin. In light of this shift in the law, the Phelpses moved to reinstate Gregory's emotional distress damages. The trial court granted the motion. PIC appeals this ruling.

II. ANALYSIS.
¶ 20 We first address the question as to whether Dr. Lindemann was a "borrowed employee," as the resolution of that issue eliminates the need to resolve the second issue. As noted, the supreme court remanded this matter "for a determination of whether Dr. Lindemann was a `borrowed employee' of St. Joseph's Hospital and therefore entitled to the cap protection as an `employee' of a health care provider under WIS. STAT. § 893.55(4)(b)." Phelps II, 282 Wis.2d 69, ¶ 4, 698 N.W.2d 643. Because the parties elected to have the trial court decide this matter on the basis of the existing record, we owe no deference to the trial court's decision. State ex rel. Sieloff v. Golz, 80 Wis.2d 225, 241, 258 N.W.2d 700 (1977) (A reviewing court is not bound by any inferences drawn by a factfinder from a documentary record, and we need not accord deference to such a finding.).
¶ 21 In reaching its decision, the trial court stated inter alia that:
MCWAH and a number of hospitals engaged in what I think would be called a "joint venture," a joint effort to create employment circumstances that benefited presumably all of the parties. And the result is someone who is, in some senses, an employee of one entity and in some senses an employee of another and in some senses clearly an employee of both.
We cannot agree with the court's determination. The trial court's suggestion that there was a "joint venture" is nothing more than a newly-worded name for the "dual liability" rule that was rejected in DePratt v. Sergio, 102 Wis.2d 141, 306 N.W.2d 62 (1981). "We conclude, however, that the dual liability approach, although having some merit, does not offer a simple and easily applicable alternative to the borrowed servant rule, and we decline to substitute it for the present rule." Id. at 146, 306 N.W.2d 62. Thus, in factual circumstances such as those present here, the correct test is to determine whether Dr. Lindemann was the "borrowed employee" of MCWAH.
¶ 22 The seminal case defining a "borrowed employee" is Seaman Body Corp. v. Industrial Commission, 204 Wis. 157, 235 N.W. 433 (1931). While there has been much criticism of the rule, its vitality cannot be questioned. DePratt, 102 Wis.2d at 147, 306 N.W.2d 62. In a more recent case, Borneman v. Corwyn Transport, Ltd., 219 Wis.2d 346, 580 N.W.2d 253 (1998), the test was examined. There the supreme court wrote that:
The Seaman loaned employee test has two aspects: three elements and four vital questions as follows:

*886 The relation of employer and employee exists as between a special employer to whom an employee is loaned whenever the following facts concur: (a) Consent on the part of the employee to work for a special employer; (b) Actual entry by the employee upon the work of and for the special employer pursuant to an express or implied contract so to do; (c) Power of the special employer to control the details of the work to be performed and to determine how the work shall be done and whether it shall stop or continue.
The vital questions in controversies of this kind are: (1) Did the employee actually or impliedly consent to work for a special employer? (2) Whose was the work he was performing at the time of injury? (3) Whose was the right to control the details of the work being performed? (4) For whose benefit primarily was the work being done?
Borneman, 219 Wis.2d at 353-54, 580 N.W.2d 253 (quoting Seaman, 204 Wis. at 163, 235 N.W. 433).
¶ 23 Also of importance to the question posed by the supreme court is the presumption, under Seaman, which states:
In the absence of evidence to the `contrary, . . . the actor remains in his [or her] general employment so long as, by the service rendered another, he [or she] is performing the business entrusted to [them] by the general employer. There is no inference that because the general employer has permitted a division of control, [the employer] has surrendered it.
Estate of Hegarty ex rel. Hegarty v. Beauchaine, 2001 WI App 300, ¶ 69, 249 Wis.2d 142, 638 N.W.2d 355 (Hegarty I) (citation omitted; alterations in Hegarty).
1. Dr. Lindemann did not "actually or impliedly consent to work for a special employer."
¶ 24 There can be no dispute that Dr. Lindemann was initially employed by MCWAH. He signed a written employment agreement with MCWAH. MCWAH paid his salary, provided him with health, disability, life, medical malpractice and accidental death and dismemberment insurance. MCWAH determined when he could take a vacation and had the sole right to terminate him. As a result of his employment with MCWAH, Dr. Lindemann had been on three separate rotations in other hospitals before his placement with St. Joseph's. As we learned in a strikingly similar case involving the negligence of a first-year resident that ultimately resulted in the tragic death of the patient, Hegarty I, 249 Wis.2d 142, 638 N.W.2d 355, the program directors, who are officers of MCWAH, supervise and control the activities of the residents in the program. See id., ¶ 62 n. 6. In addition, the OB-GYN program in which Dr. Lindemann participated was managed by the Medical College of Wisconsin and the medical staff.
¶ 25 The question then becomes whether Dr. Lindemann agreed to become the employee of St. Joseph's. The most persuasive evidence supporting the conclusion that he did not is Dr. Lindemann's own testimony and the admissions of St. Joseph's Hospital. Indeed, in the admissions, St. Joseph's denied being Dr. Lindemann's employer, denied having the right to control or supervise Dr. Lindemann and denied being legally responsible for Dr. Lindemann's health care services. Additionally, Dr. Lindemann testified that he had a written employment agreement with MCWAH and considered MCWAH his employer, and he never signed an employment agreement with anyone else. Our review of the record convinces us that Dr. Lindemann was never an employee of St. *887 Joseph's Hospital.[6] In order to consent to become the employee of another there must be something more than an agreement to assist in the work of another. "The distinction between the mere consent of an employee to perform certain acts for a borrowing employer and the employee's consent to enter into a new employment relationship with the borrowing employer is important." Borneman, 219 Wis.2d at 358, 580 N.W.2d 253. In the supreme court Borneman case, the court approved this court's determination that "the consent of an employee to enter into a new employment relationship with a borrowing employer is the most critical inquiry in the Seaman test." Id. at 356, 580 N.W.2d 253 (citing Borneman v. Corwyn Transport, Ltd., 212 Wis.2d 25, 33, 567 N.W.2d 887 (Ct.App.1997)). Coupled with the presumption that "[i]n the absence of evidence to the contrary, . . . the actor remains in his or [her] general employment," there appears to be little doubt that Dr. Lindemann remained an employee of MCWAH. Hegarty I, 249 Wis.2d 142, ¶ 69, 638 N.W.2d 355. Nevertheless, for completeness sake, we will examine the other parts of the Seaman test.
2. Dr. Lindemann was not performing St. Joseph's Hospital's work at the time of the injury.
¶ 26 Stated differently, the second requirement to satisfy the test for a borrowed employee is whether there was "[a]ctual entry by the employee upon the work of and for the special employer pursuant to an express or implied contract so to do." Borneman, 219 Wis.2d at 353, 580 N.W.2d 253. Certainly Dr. Lindemann worked at St. Joseph's Hospital. However, despite St. Joseph's providing Dr. Lindemann with uniforms, meals, parking privileges and a place to rest, he was not engaged in "the work of and for" the hospital. The current medical scheme utilized in this locale is for hospitals to provide a building containing beds, meals and medical and laboratory, testing equipment, along with nursing staff, while the doctors deliver medical and surgical services. Had Dr. Lindemann actually ben a licensed doctor in private practice, he would not have been a St. Joseph's employee, but rather, an independent contractor. See Kashishian v. Port, 167 Wis.2d 24, 34, 481 N.W.2d 277 (1992).
¶ 27 Dr. Lindemann was an unlicensed doctor, but a doctor nonetheless. He tended to patients in his capacity as a doctor, but with restrictions; e.g., he could not perform surgery. Consequently, while there, he delivered medical services. Just as private physicians do not become employees of every hospital where they see their hospitalized patients, Dr. Lindemann did not become a hospital employee when he provided medical services to St. Joseph's patients.[7] Certainly hospitals are free to hire doctors, and some do, and make them their employees. However, that was not the option chosen by either St. Joseph's or, apparently, other local hospitals with respect to first-year and senior residents. Rather, they contracted with MCWAH and its program directors to pay, assign, control and evaluate first-year residents. *888 Additionally, no St. Joseph's employee has been identified as providing any oversight for Dr. Lindemann. Indeed, this lack of oversight resulted in St. Joseph's being found negligent. Dr. Lindemann validated this when he testified that he could exercise independent judgment while treating patients, and he was never provided with any handbook setting forth the rules, practices and procedures of St. Joseph's Hospital.
3. MCWAH program directors and employees, as well as private physicians, controlled the details of Dr. Lindemann's work.
¶ 28 Dr. Lindemann received his patient assignments from senior residents and attending physicians at St. Joseph's. Neither are St. Joseph's employees. Further, as we learned in Hegarty 1, 249 Wis.2d 142, ¶¶ 62 n. 6, 67, 638 N.W.2d 355, MCWAH supervises and controls its residency programs and regulates the activities of its residents through its program directors, who are officers of MCWAH.[8] Thus, MCWAH employees (senior residents) and program directors had primary responsibilities for the first-year residents. In addition, the supervisors for Dr. Lindemann while he was in the OB-GYN rotation were doctors associated with the Medical College and not employees of St. Joseph's. Also, when tending to patients, Dr. Lindemann was supervised by the attending physician. These doctors, including Marlene's private physician, were not employees of St. Joseph's. Consequently, St. Joseph's did not control the details of Dr. Lindemann's work.
4. Dr. Lindemann's work benefited MCWAH, as well as the patients, private physicians and the hospital.
¶ 29 While it can be argued that generally medical care benefits everyone  patients, hospitals and doctors  Dr. Lindemann's work of providing medical services was done primarily to fulfill the requirements he needed to become a licensed doctor in the State of Wisconsin. MCWAH was the entity responsible for paying, assigning, supervising and controlling first-year residents to accomplish this requirement. As a result, Dr. Lindemann was providing a service to MCWAH, as it was MCWAH's task to train doctors to become licensed physicians. Additionally, in so doing, he was assisting the private physicians who had primary responsibilities for their patients.
¶ 30 Hegarty I and Estate of Hegarty ex rel. Hegarty v. Beauchaine, 2006 WI App 248, 297 Wis.2d 70, 727 N.W.2d 857 (Hegarty II), support this conclusion. In Hegarty I, MCWAH had been dismissed from the medical malpractice suit. Id., 249 Wis.2d 142, ¶ 1, 638 N.W.2d 355. MCWAH sought to sustain that determination. This court reversed and remanded. Id., ¶ 78. In Hegarty II, in examining MCWAH's role as an employer, this court concluded, based on reasons not unlike those present here, that a first-year resident was not a borrowed employee of the hospital.
OHIC points to facts that suggest that there was an interplay between the Medical College, Children's [Hospital] and MCWAH, but none of it informs us about the crucial questions of consent and control, and the cited facts do not *889 even come close to rebutting the presumption that Dr. Beauchaine was not a loaned or borrowed employee.
Hegarty II, 297 Wis.2d 70, ¶ 73, 727 N.W.2d 857.
¶ 31 In sum, after addressing the Seaman factors for a "borrowed employee," we conclude that the test has not been met. There is no evidence that Dr. Lindemann left MCWAH's employment and agreed to become a St. Joseph's employee. Dr. Lindemann provided medical services similar to those provided by private physicians who are not St. Joseph's employees. MCWAH directed which hospital Dr. Lindemann worked at and paid him. Dr. Lindemann and MCWAH had a written contract, and MCWAH had the sole right to terminate him. MCWAH never relinquished any control over Dr. Lindemann. Indeed, as noted, while at St. Joseph's no hospital employee supervised Dr. Lindemann, and Dr. Lindemann was never given a handbook or any rules setting out St. Joseph's procedures. Thus, the right to control Dr. Lindemann remained' in the hands of MCWAH's program director, MCWAH senior residents and private physicians. Finally, Dr. Lindemann's services benefited the patients of the hospital and the private physicians but most of all, Dr. Lindemann's work aided MCWAH in its mission to train first-year residents in order to become licensed physicians. Therefore, Dr. Lindemann was not a "borrowed employee."
¶ 32 Because Dr. Lindemann was not a "borrowed employee" of a health care provider, the Wis. STAT, ch. 655 caps are irrelevant to this case. Consequently, we decline to address whether the caps prevent Gregory from obtaining damages for his emotional distress claim. As a result, the trial court's order in this respect is affirmed. However, we reverse the trial court's determination with regard to Dr. Lindemann's "borrowed employee" status.[9]
Orders affirmed in parts and reversed in part.
NOTES
[] Petition for review.
[1] PIC has couched the issue as follows:

Whether the Wisconsin Supreme Courts decisions in Finnegan [v. Wisconsin Patients Compensation Fund, 2003 WI 98, 263 Wis.2d 574, 666 N.W.2d 797,] and Pierce [v. Physicians Insurance Co. of Wisconsin, 2005 WI 14, 278 Wis.2d 82, 692 N.W.2d 558,] preclude an award of emotional distress bystander damages in a medical malpractice action governed by Wis. Stat. ch. 655, to a father who witnesses the death of his child during delivery that [sic] when death was caused by medical negligence earlier in the day and was, attenuated in time from the death?
In our view this question would only come into play if Dr. Lindemann was a borrowed employee. Because we have determined that he was not a borrowed employee and consequently, not subject to WIS. STAT. ch. 655 (1997-98), given that the only issue remanded to the trial court by the supreme court was whether Dr. Lindemann was a borrowed employee, we deem it inappropriate to address what impact the holdings in the Finnegan and Pierce cases may have on Gregory's emotional distress damages.
[2] All references to the Wisconsin Statutes are to the 1997-98 version unless otherwise noted.
[3] Wisconsin Stat. § 655.001(10m) defines "physician" as "a medical or osteopathic physician licensed under ch. 448."
[4] The supreme court, in Phelps v. Physicians Ins. Co. of WIS., 2005 WI 85, ¶ 43, 282 Wis.2d 69, 698 N.W.2d 643 (Phelps II), later found the correct standard of care upon which to judge Dr. Lindemann's actions was that of an unlicensed first-year resident, not that of a practicing doctor.
[5] The court awarded an additional sum of $1015 as special damages related to Adam's death.
[6] In the Phelpses' briefs, they devote much of their argument to a requirement that in order to become a borrowed employee, MCWAH must relinquish full direction and control of Dr. Lindemann. PIC claims there is no need for full relinquishment. We do not view this issue as being pivotal to our conclusion and therefore, do not address it.
[7] Curiously, other than stating that Dr. Lindemann performed medical services for St. Joseph's, nowhere in PIC's brief does there appear an example of an activity undertaken by Dr. Lindemann that was work done on behalf of St. Joseph's.
[8] As can be seen, the dissent's insistence in Phelps II that "MCWAH is, in essence a conduit to facilitate payments, and has no supervisory or control role over the residents" is an oversimplification. Id., 282 Wis.2d 69, ¶ 95, 698 N.W.2d 643 (Prosser, J., dissenting). Moreover, even if MCWAH had no supervisory or control over the residents via its directors, this does not lead to the inevitable conclusion that the hospital did.
[9] We recognize that our ruling reveals an anomaly in the medical malpractice, scheme, as set forth in WIS. STAT, ch. 655. However, it is the function of the legislature, not this court, to correct any perceived shortcomings in the statute.