Gregory PHELPS, Marlene L. Phelps,
Estate of Adam Phelps, Deceased,
by his Special Administrator, Gregory G. Phelps,
Caroline Phelps and Kyle Phelps, minors, by
their Guardian ad Litem, William M. Cannon,
Plaintiffs-Respondents-Cross-Appellants,

v.

PHYSICIANS INSURANCE CO. OF WISCONSIN, INC.,
a Wisconsin insurance corporation and Matthew
Lindemann, M.D., Defendants-Appellants-
Cross-Respondents-Petitioners.

Supreme Court

*No. 2006AP2599. Oral argument March 5, 2009.
—Decided July 10, 2009.*

2009 WI 74

(Also reported in 768 N.W.2d 615.)

For the defendants-appellants-cross-respondents-petitioners there were briefs by *Michael B. Van Sicklen, Katherine C. Smith,* and *Foley & Lardner LLP,* Madison, and oral argument by *Michael B. Van Sicklen.*

For the plaintiffs-respondents-cross-appellants there were briefs by *William M. Cannon, Sarah F. Kaas, Edward E. Robinson,* and *Cannon & Dunphy, S.C.,* Brookfield, and oral argument by *William M. Cannon.*

An amicus curiae brief was filed by *Martha H. Heidt* and *Bye, Goff, Rhode & Skow, Ltd.,* River Falls, on behalf of the Wisconsin Association for Justice.

An amicus curiae brief was filed by *Timothy J. Muldowney, Robert J. Dreps, Jennifer L. Peterson,* and *Godfrey & Kahn SC,* Madison; *Ruth Heitz* and *Wisconsin Medical Society,* Madison; and *Leonard Nelson* and *AMA Litigation Center,* Chicago, on behalf of the Wisconsin Medical Society and the American Medical Association.

¶ 1. PATIENCE DRAKE ROGGENSACK, J. We review a published decision of the court of appeals,[1] which reversed in part and affirmed in part a decision of the circuit court.[2] There are two questions presented for our review: (1) whether Dr. Matthew Lindemann (Lindemann) was a borrowed employee of St. Joseph's Hospital of Milwaukee (St. Joseph's), and was therefore an employee of a health care provider subject to Wis. Stat. ch. 655 and Wis. Stat. § 893.55(4) (1997–98);[3] and

---

[1] *Phelps v. Physicians Ins. Co. of Wis., Inc.,* 2008 WI App 6, 307 Wis. 2d 184, 744 N.W.2d 880 (*Phelps III*).

[2] The Honorable John A. Franke of Milwaukee County Circuit Court presided.

[3] All further references to the Wisconsin Statutes are to the 1997–98 version unless otherwise noted.

(2) whether Gregory Phelps (Gregory) can recover damages caused by Lindemann's negligence on a theory of the negligent infliction of emotional distress to a bystander. We conclude that Lindemann was a borrowed employee of St. Joseph's, and was therefore an employee of a health care provider under ch. 655. As a result, ch. 655 governs Gregory's claim. We further conclude that ch. 655 does not permit claims arising from medical negligence other than those listed in Wis. Stat. §§ 655.005(1) and 655.007, and the negligent infliction of emotional distress to a bystander is not one of those claims. Therefore, Gregory's claim is not actionable under Wisconsin law. Accordingly, we reverse the decision of the court of appeals, and remand the cause to the circuit court to issue an order dismissing Gregory's claim.

## I. BACKGROUND

A. Factual Summary

¶ 2. This is a long, drawn-out litigation that has been wandering through the Wisconsin court system for more than eight years. The underlying facts have been the source of three separate published appellate opinions. *See Phelps v. Physicians Ins. Co. of Wis., Inc.,* 2004 WI App 91, ¶ 1, 273 Wis. 2d 667, 681 N.W.2d 571 (*Phelps I*); *Phelps v. Physicians Ins. Co. of Wis., Inc.,* 2005 WI 85, ¶¶ 5–13, 282 Wis. 2d 69, 698 N.W.2d 643 (*Phelps II*); *Phelps v. Physicians Ins. Co. of Wis., Inc.,* 2008 WI App 6, ¶¶ 2–11, 307 Wis. 2d 184, 744 N.W.2d 880 (*Phelps III*). Our summary of the relevant facts here largely restates the factual summaries in those prior decisions.

¶ 3. Marlene Phelps (Marlene) discovered that she was pregnant with twins in June 1998. Due to

9

medical complications, she was placed on strict home bed rest. Marlene's pregnancy then progressed without incident until October 18, 1998, when another medical complication occurred. She was admitted to St. Joseph's and continued her program of bed rest in the hospital. Two days later, an ultrasound revealed that one of the twins was in a breech presentation. As a result, Marlene was deemed a high-risk patient who likely would require a caesarean section for delivery of the twins.

¶ 4. In the early morning of November 24, 1998, Marlene was awakened by constant suprapubic pain. The on-call resident, Lindemann, was contacted. Lindemann was an unlicensed first-year resident and an employee of the Medical College of Wisconsin Affiliated Hospitals, Inc. (Affiliated Hospitals entity). His primary duty at this time was to assess and report findings and differential diagnoses on St. Joseph's patients to a senior resident or to the attending obstetrician.

¶ 5. Lindemann ordered lactated Ringer's solution to be administered to Marlene at 2:40 a.m., for suspected contractions. It did not alleviate Marlene's pain. At 3:00 a.m., Lindemann made a differential diagnosis of her pain that included bladder infection, labor and placental abruption. He ordered a urinalysis in regard to a potential bladder infection. The results of that test were negative.

¶ 6. At 4:15 a.m., Marlene requested that the attending nurse call Lindemann again due to continued pain. Fetal heart monitoring showed that the twins' heart rates were within normal ranges. Lindemann informed Marlene that he would take an ultrasound so he could consult a senior resident about her condition.

¶ 7. After the ultrasound, potent narcotics were administered to Marlene at 4:50 a.m. and 5:20 a.m., on Lindemann's orders, but he was neither seen nor heard

from between 4:15 a.m. and 6:00 a.m. He never satisfactorily explained his whereabouts during this time. There is no evidence that he ever contacted a senior resident to discuss the ultrasound and Marlene's case.

¶ 8. Marlene was still in pain when Lindemann examined her again at 6:00 a.m. At 6:45 a.m., Marlene's husband, Gregory, arrived at the hospital. Marlene informed Gregory that she needed to defecate and asked for assistance to get to the commode. At 7:00 a.m., while sitting on the commode, she reached down and felt toes extending from her.

¶ 9. Gregory rushed to the nurses' desk where he found another doctor, who delivered Adam Phelps at 7:20 a.m. Adam was immediately rushed to the neonatal intensive care unit where hospital staff attempted to resuscitate him. The efforts were unsuccessful, and he was pronounced dead at 7:36 a.m. Adam's death was caused by asphyxia due to umbilical cord entrapment and placental abruption, which impaired his oxygen supply.

¶ 10. While hospital staff were attempting to resuscitate Adam, Marlene was taken to the operating room. The second twin, Kyle, was delivered at 7:43 a.m. Afterward, the treating physicians questioned Lindemann about his decisions, his whereabouts and his diagnosis.

B. Procedural History

1. Prior appeal

¶ 11. Gregory and Marlene, along with their two surviving children, Kyle and Caroline (collectively, the Phelpses), sued Lindemann and his insurer, Physician's Insurance Company of Wisconsin (Physicians), St.

11

Joseph's, St. Joseph's insurer, and the Affiliated Hospitals entity, in Milwaukee County Circuit Court, alleging negligence, loss of society and companionship, wrongful death and negligent infliction of emotional distress.

¶ 12. The Honorable Michael P. Sullivan presided over the initial trial proceedings. Prior to trial, Judge Sullivan dismissed the Affiliated Hospitals entity from the case, concluding that even though Lindemann was an employee of the Affiliated Hospitals entity, he was not the Affiliated Hospitals entity's "servant" because the Affiliated Hospitals entity did not control or supervise his medical decisions performed at St. Joseph's. Therefore, the Affiliated Hospitals entity could not be held liable on a theory of respondeat superior. This decision was not appealed. The Phelpses then moved for a declaratory ruling that St. Joseph's was Lindemann's employer. Before Judge Sullivan could rule, however, the Phelpses and St. Joseph's settled, and St. Joseph's was dismissed from the litigation.

¶ 13. The day before trial, Judge Sullivan struck Lindemann's jury demand because Lindemann's lawyer had been late in paying the jury fee. A bench trial was then held. Judge Sullivan found Lindemann 80% causally negligent and St. Joseph's 20% causally negligent. Judge Sullivan awarded the Phelpses $990,000, to be distributed as follows: (1) $500,000 total to Gregory and Marlene for the wrongful death of Adam; (2) $200,000 each to Gregory and Marlene for emotional distress; and (3) $45,000 each to Kyle and Caroline for the loss of society and companionship of their mother, Marlene.

¶ 14. Lindemann and Physicians appealed. The court of appeals held that Judge Sullivan had erred when he struck Lindemann's jury demand, and remanded for a new trial. *Phelps I,* 273 Wis. 2d 667, ¶ 18.

12

The court also concluded that the circuit court had applied an incorrect standard of care in concluding that Lindemann was liable. *Id.*, ¶¶ 23–25. Furthermore, the court held that Lindemann was not a statutory health care provider, and that the noneconomic damages caps set forth in Wis. Stat. § 893.55(4) did not apply. *Id.*, ¶¶ 41–47. The court of appeals also directed the circuit court to make factual findings on remand to determine whether some evidence should have been excluded under the statutory peer review privilege. *Id.*, ¶ 40.

¶ 15. Lindemann and Physicians had argued to the circuit court and the court of appeals that Wis. Stat. ch. 655 barred the Phelpses' claims for negligent infliction of emotional distress to a bystander. *Id.*, ¶ 48. Because the court of appeals concluded that Lindemann was not a health care provider under ch. 655, it did not address this argument. *Id.* However, the court of appeals did remand the case to the circuit court to make findings of fact regarding whether Lindemann was St. Joseph's borrowed employee, which would have rendered him an employee of a health care provider, thereby bringing the Phelpses' claims under ch. 655 and the noneconomic damages caps set forth in Wis. Stat. § 893.55(4). *Id.*, ¶ 46 n.10.

¶ 16. We granted the parties' cross-petitions for review. *Phelps II*, 282 Wis. 2d 69, ¶¶ 2–3. We reversed that aspect of the decision of the court of appeals granting defendants a new trial based on their failure to timely pay the jury fee. *Id.*, ¶ 36. Furthermore, while we agreed with the court of appeals that the applicable standard of care to apply to Lindemann was that of a first-year, unlicensed resident, we concluded that the circuit court properly exercised its discretion in allocating 80% of the negligence to Lindemann. *Id.*, ¶ 47.

13

¶ 17. We reversed the court of appeals' decision to remand the case to the circuit court for further findings of fact regarding whether some evidence should have been excluded under the peer review privilege. *Id.*, ¶ 54. Instead, we concluded, as a matter of law, that the peer review privilege did not apply to the facts of the case. *Id.*, ¶¶ 52–54.

¶ 18. Finally, we affirmed that aspect of the court of appeals' decision concluding that Lindemann was not a health care provider under Wis. Stat. § 893.55(4), and as a result, we concluded that the noneconomic damages cap set forth in that statute did not apply. *Id.*, ¶ 64. However, acknowledging that "this may ultimately be dispositive of our discussion of the cap on noneconomic damages," *id.*, ¶ 4 n.4, we remanded the matter to the circuit court to develop a factual record from which it could be determined whether Lindemann was a borrowed employee of St. Joseph's, and therefore an employee of a health care provider, *id.*, ¶ 4. If so, the noneconomic damages cap would apply to him because he was an employee of a health care provider.[4] This remand on the borrowed employee question initiated the proceedings that are the subject of our review here.

---

[4] Wisconsin Stat. § 893.55(4)(b), which outlines the types of claims to which the noneconomic damages caps in § 893.55(4)(d) and (f) apply, provides:

> The total noneconomic damages recoverable for bodily injury or death, including any action or proceeding based on contribution or indemnification, may not exceed the limit under par. (d) for each occurrence on or after May 25, 1995, *from all health care providers and all employes of health care providers* acting within the scope of their employment and providing health care services who are found negligent and from the patients compensation fund.

(Emphasis added.)

## 2. Present appeal

¶ 19. On remand, the circuit court applied the test we set forth in *Seaman Body Corp. v. Industrial Commission of Wisconsin*, 204 Wis. 157, 235 N.W. 433 (1931), to determine whether Lindemann was a borrowed employee. The circuit court made findings of fact, based on written submissions relating to whether: (1) Lindemann consented to work for St. Joseph's; (2) Lindemann entered upon the work of St. Joseph's pursuant to either an express or an implied agreement to do so; (3) St. Joseph's had primary control over the details of Lindemann's work at St. Joseph's; and (4) Lindemann's work was performed primarily for the benefit of St. Joseph's. Based on the findings it made from these evidentiary submissions, the circuit court concluded that Lindemann was a borrowed employee, and was therefore an employee of a health care provider. These conclusions subjected the Phelpses' claims to the noneconomic damages caps set forth in Wis. Stat. § 893.55(4).

¶ 20. The Phelpses moved for reconsideration. They argued that Lindemann could not be a borrowed employee because (1) the circuit court's factual finding that Lindemann consented to work for St. Joseph's was erroneous; and (2) the circuit court made no finding

---

Wisconsin Stat. § 655.017, which links Wis. Stat. ch. 655 to the noneconomic damages caps set forth in Wis. Stat. § 893.55(4), provides:

> The amount of noneconomic damages recoverable by a claimant or plaintiff under this chapter *for acts or omissions of a health care provider* if the act or omission occurs on or after May 25, 1995, and *for acts or omissions of an employe of a health care provider,* acting within the scope of his or her employment and providing health care services, for acts or omissions occurring on or after May 25, 1995, is subject to the limits under s. 893.55(4)(d) and (f).

(Emphasis added).

that the Affiliated Hospitals entity relinquished full and exclusive control over Lindemann.

¶ 21. The circuit court denied the motion, reiterating its finding that even though Lindemann did not expressly consent to work for St. Joseph's, he impliedly did so. In addition, the circuit court concluded that an employer need not relinquish full and exclusive control over the employee to the borrowing employer in order for the employee to be considered a borrowed employee. As a result, the circuit court stood by its decision concluding that Lindemann was a borrowed employee of St. Joseph's.

¶ 22. Between the filing of the Phelpses' initial complaint and before the circuit court decisions on the borrowed employee question, we decided several cases potentially affecting the outcome of this case. *See Ferdon v. Wis. Patients Comp. Fund,* 2005 WI 125, 284 Wis. 2d 573, 701 N.W.2d 440; *Pierce v. Physicians Ins. Co. of Wis., Inc.,* 2005 WI 14, 278 Wis. 2d 82, 692 N.W.2d 558; *Maurin v. Hall,* 2004 WI 100, 274 Wis. 2d 28, 682 N.W.2d 866.

¶ 23. In civil cases, we generally presume that our rulings apply to pending litigation. *Wenke v. Gehl Co.,* 2004 WI 103, ¶ 69, 274 Wis. 2d 220, 682 N.W.2d 405.[5] The circuit court decided that it was its responsibility, within the scope of our remand, to determine the effect of *Ferdon, Pierce* and *Maurin* on the Phelpses' claims,[6]

---

[5] The parties do not argue that the presumption of application of our rulings to pending litigation is overcome here. *See generally Wenke v. Gehl Co.,* 2004 WI 103, ¶¶ 69–75, 274 Wis. 2d 220, 682 N.W.2d 405 (discussing the effect of court rulings on pending litigation).

[6] On their first appeal, the defendants had asked the court to stay its decision pending our resolution of *Pierce v. Physicians Insurance Co. of Wis., Inc.,* 2005 WI 14, 278 Wis. 2d 82,

after concluding that Lindemann was a borrowed employee and subject to the noneconomic damages caps set forth in Wis. Stat. § 893.55(4). The Phelpses argued that our decision in *Ferdon* precluded application of *any* damages cap to their claims. However, in *Ferdon,* while we held that the cap on noneconomic damages arising from medical malpractice set forth in § 893.55(4)(d) was unconstitutional, *Ferdon,* 284 Wis. 2d 573, ¶ 105, we held that the cap for wrongful death, incorporated into § 893.55(4)(f), was valid, *id.,* ¶ 16. Because *Ferdon* had no effect on the constitutionality of the wrongful death cap of § 893.55(4)(f), the circuit court concluded that § 893.55(4)(f)'s cap on wrongful death limited the Phelpses' damages.

¶ 24. In *Maurin,* we held that Wis. Stat. § 893.55(4)(f) incorporates a single cap on all damages for wrongful death, including those for conscious pain and suffering. *Maurin,* 274 Wis. 2d 28, ¶ 88. For purposes of the Phelpses' claims, the wrongful death cap under § 893.55(4)(f) was $500,000. As a result, under *Maurin,* the award of $500,000 to Gregory and Marlene for the wrongful death of Adam exhausted the cap on noneconomic damages for his wrongful death.

692 N.W.2d 558, and *Maurin v. Hall,* 2004 WI 100, 274 Wis. 2d 28, 682 N.W.2d 866. *Phelps v. Physicians Ins. Co. of Wis., Inc.,* 2004 WI App 91, ¶ 50 n.11, 273 Wis. 2d 667, 681 N.W.2d 571 (*Phelps I*). The court declined to do so. *Id.* When we decided *Phelps v. Physicians Ins. Co. of Wis., Inc.,* 2005 WI 85, 282 Wis. 2d 69, 698 N.W.2d 643 (*Phelps II*), we did not address the effect of *Pierce* and *Maurin* at all because "[s]uch issues were not briefed or argued by the parties." *Phelps II,* 282 Wis. 2d 69, ¶ 21 n.6. Finally, we decided *Ferdon v. Wisconsin Patients Compensation Fund,* 2005 WI 125, 284 Wis. 2d 573, 701 N.W.2d 440, after our decision in *Phelps II,* so its effect on the Phelpses' claims also was considered by the circuit court.

17

¶ 25. The remaining dispute was whether the rest of the $490,000 in damages also was subject to the cap on wrongful death incorporated into Wis. Stat. § 893.55(4)(f). The circuit court concluded that Gregory's $200,000 award for damages based on the negligent infliction of emotional distress to a bystander was barred by § 893.55(4)(f) because Gregory's damages were inextricably linked to Adam's death.[7] As a result, the circuit court vacated that portion of the $490,000 award.

¶ 26. Though the same result appeared mandated for Marlene's bystander claim, the circuit court concluded that our decision in *Pierce* created different footings for her claim. In *Pierce,* we concluded that a mother in childbirth, such as Marlene, experiences emotional distress damages in a manner different from that of a third person who merely witnesses the childbirth, such as Gregory. *Pierce,* 278 Wis. 2d 82, ¶ 15. Specifically, a mother in childbirth suffers injuries as a participant or victim of the medical malpractice, and her injuries are distinct from witnessing the injury to and death of her child. *Id.* As a result, a mother can pursue a separate claim for medical malpractice. *Id.,* ¶ 1. In light of *Pierce,* the circuit court determined that

---

[7] The circuit court struggled with our decision in *Finnegan v. Wisconsin Patients Compensation Fund,* 2003 WI 98, 263 Wis. 2d 574, 666 N.W.2d 797, where we held that the Finnegans' claims for bystander negligent infliction of emotional distress were barred. *Id.,* ¶ 3. Justice Sykes' lead opinion (joined by Justices Wilcox and Prosser) determined that Wis. Stat. ch. 655 precluded bystander claims altogether, *id.,* ¶ 2 (lead opinion of Sykes, J.), while a majority of the court concluded that even if ch. 655 did not bar such claims, the plaintiffs had failed to make an adequate showing under our decision in *Bowen v. Lumbermens Mutual Casualty Co.,* 183 Wis. 2d 627, 517 N.W.2d 432 (1994). *Finnegan,* 263 Wis. 2d 574, ¶ 3.

18

Marlene's claim was not subject to the cap on noneconomic damages for Adam's wrongful death, and the court allowed her award of $200,000 to stand.[8]

¶ 27. About a month after the circuit court issued its decision on damages, we issued our decision in *Bartholomew v. Wisconsin Patients Compensation Fund*, 2006 WI 91, 293 Wis. 2d 38, 717 N.W.2d 216. In *Bartholomew*, we overruled *Maurin*. A majority of the court, via different rationales, concluded that the legislature had intended to adopt two damages caps, "a medical malpractice cap for noneconomic damages for predeath claims and a wrongful death cap for noneconomic damages for postdeath loss of society and companionship. Claimants [could] thus recover for the different damages up to the separate limits of the applicable respective cap." *Bartholomew*, 293 Wis. 2d 38, ¶ 127.

¶ 28. In light of *Bartholomew*, the Phelpses filed a motion for reconsideration, requesting that Gregory's $200,000 award for damages due to the negligent infliction of emotional distress to a bystander be reinstated. The circuit court granted the motion. Though the court acknowledged some difficulty in determining whether a bystander claim "is a predeath or postdeath claim," the court concluded that such a claim ought to be considered a predeath claim, because "[t]he history of . . . wrongful death claims . . . is limited to something else." As a result, the circuit court held that the noneconomic damages cap in Wis. Stat. § 893.55(4)(f) did not apply to Gregory's claim, and it reinstated the $200,000 award.

---

[8] The circuit court also upheld the surviving children's awards of $45,000 each. No argument has been raised before us that those awards were erroneous.

¶ 29. Following the circuit court's decision on the Phelpses' second motion for reconsideration, Lindemann paid that portion of the damage award due to Marlene and the two children. He then appealed the circuit court's order reinstating Gregory's $200,000 award for damages due to the negligent infliction of emotional distress to a bystander. The Phelpses cross-appealed, challenging the circuit court's findings and conclusion that Lindemann was a borrowed employee of St. Joseph's.

¶ 30. The court of appeals reversed the circuit court's ruling that Lindemann was a borrowed employee. *Phelps III,* 307 Wis. 2d 184, ¶ 1. In so doing, the court of appeals concluded that the clearly erroneous standard of review did not apply to the circuit court's findings of fact, because those findings were based on a paper record. *Id.,* ¶ 20 (citing *State ex rel. Sieloff v. Golz,* 80 Wis. 2d 225, 241, 258 N.W.2d 700 (1977)). Instead, the court of appeals reviewed the circuit court's findings de novo. *Id.*

¶ 31. In applying the borrowed employee test from *Seaman,* the court of appeals found that (1) Lindemann never consented to be St. Joseph's employee, *id.,* ¶ 25; (2) Lindemann was not performing the work of St. Joseph's, *id.,* ¶¶ 26–27; (3) St. Joseph's did not control the details of Lindemann's work, *id.,* ¶ 28; and (4) Lindemann's work primarily benefited the Affiliated Hospitals entity, not St. Joseph's, *id.,* ¶ 29.

¶ 32. Because the court of appeals concluded that all of the *Seaman* factors weighed against Lindemann being a borrowed employee, it concluded that he was not. As a result, Lindemann was not an employee of a health care provider under Wis. Stat. § 893.55(4), and none of the caps on noneconomic damages set forth in

that section applied to Gregory's claim. Accordingly, the court of appeals affirmed that aspect of the circuit court's decision reinstating Gregory's $200,000 award for bystander negligent infliction of emotional distress.

¶ 33. We granted the defendants' petition for review. In addition to the questions posed by the parties regarding Lindemann's status as a borrowed employee and the effect of that classification on Gregory's damages award under Wis. Stat. § 893.55(4), we requested supplemental briefing from the parties to address two additional questions:

> (1) Does Wis. Stat. ch. 655 bar bystander negligent infliction of emotional distress claims made against health care providers?

> (2) Did the defendant waive (forfeit) the right to have this issue decided in this court?

We now reverse the decision of the court of appeals.

## II. DISCUSSION

A. Standard of Review

██

¶ 34. As the procedural history of this case indicates, determining whether Lindemann was a borrowed employee required the circuit court to make factual findings. *See Phelps II*, 282 Wis. 2d 69, ¶ 4 n.4 ("[B]ecause we cannot find facts, we remand to the circuit court the issue of whether Dr. Lindemann was a 'borrowed employee' of St. Joseph's Hospital.") We uphold a circuit court's findings of fact unless they are clearly erroneous. *Steinbach v. Green Lake Sanitary Dist.*, 2006 WI 63, ¶ 10, 291 Wis. 2d 11, 715 N.W.2d 195.

■■

¶ 35. Once the facts relevant to the borrowed employee determination are found by the circuit court, application of the *Seaman* test to those facts is a question of law. *Phelps II,* 282 Wis. 2d 69, ¶ 100 (Prosser, J., concurring); *see also Estate of Hegarty v. Beauchaine,* 2006 WI App 248, ¶¶ 66–75, 297 Wis. 2d 70, 727 N.W.2d 857. We decide questions of law independently. *Linden v. Cascade Stone Co., Inc.,* 2005 WI 113, ¶ 5, 283 Wis. 2d 606, 699 N.W.2d 189; *Mrozek v. Intra Fin. Corp.,* 2005 WI 73, ¶ 15, 281 Wis. 2d 448, 699 N.W.2d 54; *Cole v. Hubanks,* 2004 WI 74, ¶ 5, 272 Wis. 2d 539, 681 N.W.2d 147.

■

¶ 36. In addition to deciding the borrowed employee question, we interpret and apply Wis. Stat. ch. 655 and Wis. Stat. § 893.55(4) to the facts of this case. The interpretation and application of statutes are questions of law that we also review independently. *Richards v. Badger Mut. Ins. Co.,* 2008 WI 52, ¶ 14, 309 Wis. 2d 541, 749 N.W.2d 581 (citing *Marder v. Bd. of Regents of the Univ. of Wis. Sys.,* 2005 WI 159, ¶ 19, 286 Wis. 2d 252, 706 N.W.2d 110).

B. Borrowed Employee

■

¶ 37. In order to determine whether Lindemann was the borrowed employee of St. Joseph's, the circuit court was required to make findings of fact. The circuit court's findings were based on the parties' written submissions. Because the basis from which the circuit court found facts was written exhibits and submissions, the court of appeals concluded that the circuit court's findings of fact should be reviewed de novo. *Phelps III,*

307 Wis. 2d 184, ¶ 20 (citing *Golz,* 80 Wis. 2d at 241). However, in *Golz,* we were reviewing the sufficiency of an affidavit to determine if it established probable cause.[9] *Golz,* 80 Wis. 2d at 240–41.

¶ 38. Here, the circuit court was not concerned with the sufficiency of the evidence. The circuit court was concerned with the meaning of the evidence. It is within the purview of the fact finder to say what facts the evidence supports, which involves determining the meaning of disputed factual inferences from the evidence presented.[10] *Landrey v. United Servs. Auto. Ass'n,*

---

[9] We agree that the review of the *sufficiency* of documentary evidence, for a variety of purposes, is normally a question of law that we review de novo. *See, e.g., State ex rel. Grzelak v. Bertrand,* 2003 WI 102, ¶ 7, 263 Wis. 2d 678, 665 N.W.2d 244 ("The legal sufficiency of [a] petition [for certiorari] is a question of law, which this court reviews de novo."); *State v. A.S.,* 2001 WI 48, ¶ 26, 243 Wis. 2d 173, 626 N.W.2d 712 ("The sufficiency of a criminal complaint is a question of law, which we review de novo."); *Thorp v. Town of Lebanon,* 2000 WI 60, ¶ 35, 235 Wis. 2d 610, 612 N.W.2d 59 ("The legal sufficiency of a complaint presents an issue of law, which we review de novo."); *but see Village of Menomonee Falls v. Veierstahler,* 183 Wis. 2d 96, 101 n.7, 515 N.W.2d 290 (Ct. App. 1994) (citing *State ex rel. Sieloff v. Golz,* 80 Wis. 2d 225, 258 N.W.2d 700 (1977) and suggesting that Wisconsin law "is in conflict as to our standard of review of factual determinations or inferences made by a trial court based upon a documentary record").

[10] Justice Bradley suggests that we are sub silentio overruling a "long line of precedent" by refusing to apply the "documentary evidence exception" to the clearly erroneous standard of review. Justice Bradley's dissent, ¶ 74. Justice Bradley's contention is misguided for several reasons.

First, the documentary evidence exception applies to *inferences* the circuit court draws from "established or undisputed

49 Wis. 2d 150, 157, 181 N.W.2d 407 (1970) ("[W]here more than one reasonable inference can be drawn from

facts" based solely on a documentary record. *Pfeifer v. World Serv. Life Ins. Co.,* 121 Wis. 2d 567, 570, 360 N.W.2d 65 (Ct. App. 1984); *see also generally* Hon. Thomas Cane & Kevin M. Long, *Shifting the Main Event: The Documentary Evidence Exception Improperly Converts the Appellate Courts Into Fact-Finding Tribunals,* 77 Marq. L. Rev. 475 (1994). Here, where the underlying facts are in dispute, the circuit court resolves that dispute by exercising its fact-finding function, and its findings are subject to the clearly erroneous standard of review even if they are based solely on documentary evidence. Justice Bradley counters that the historical facts are essentially not in dispute. Justice Bradley's dissent, ¶ 76. We disagree. As a preliminary matter, if the facts are not in dispute, why did a majority of this court previously remand this case for fact finding? *Phelps II,* 282 Wis. 2d 69, ¶ 4 n.4. In addition, the differing findings of the circuit court and court of appeals demonstrate that evidence in the record both supports and detracts from the determination that Lindemann was St. Joseph's borrowed employee. Because the underlying facts are in dispute, the circuit court's resolution of that dispute is subject to the clearly erroneous standard of review. The documentary evidence exception has no application in this case.

Second, Justice Bradley's assertion that precedent is clear on the effect of the exception, Justice Bradley's dissent, ¶¶ 72–73, is erroneous. *Veierstahler* expressly noted that Wisconsin "law is in conflict as to our standard of review of factual determinations or inferences made by a [circuit] court based upon a documentary record." *Veierstahler,* 183 Wis. 2d at 101 n.7 (citing *Pfeifer,* 121 Wis. 2d at 570 (applying the "reasonableness" standard); *Golz,* 80 Wis. 2d at 241 (applying the de novo standard)). We do not resolve this conflict here, though, because we are reviewing the circuit court's resolution of disputed facts, not inferences drawn from undisputed facts.

Finally, although one rationale for the clearly erroneous standard of review is that "the [circuit court] is in a [better] position to pass on the credibility of the witnesses and the weight to be given to their testimony," *Vogt, Inc. v. International Brotherhood of Teamsters,* 270 Wis. 315, 71 N.W.2d 359 (1955),

24

the credible evidence, the reviewing court must accept the one reached by the fact finder." (quoting *Ernst v. Greenwald,* 35 Wis. 2d 763, 772, 151 N.W.2d 706 (1967))).

¶ 39. Furthermore, a finding of fact is clearly erroneous when "it is against the great weight and clear preponderance of the evidence." *State v. Arias,* 2008 WI 84, ¶ 12, 311 Wis. 2d 358, 752 N.W.2d 748 (quoting *State v. Sykes,* 2005 WI 48, ¶ 21 n.7, 279 Wis. 2d 742, 695 N.W.2d 277). Therefore, although evidence may have presented competing factual inferences, the circuit court's findings are to be sustained if they do not go "against the great weight and clear preponderance of the evidence." *Id.*; *Steinbach,* 291 Wis. 2d 11, ¶ 10.

¶ 40. The parties do not challenge the finding of the first circuit court[11] that Lindemann was employed by the Affiliated Hospitals entity, and that under the applicable statutory scheme at the time of Lindemann's negligence, the Affiliated Hospitals entity was not a

---

*on reargument,* 270 Wis. 321b, 321i, 74 N.W.2d 749 (1956), another important basis is the efficient use of judicial resources. As the United States Supreme Court has explained:

> [E]ven where the [trial] judge's full knowledge of the factual setting can be acquired by the appellate court, that acquisition will often come at unusual expense, requiring the court to undertake the unaccustomed task of reviewing the entire record, not just to determine whether there existed the usual minimum support for the merits determination made by the factfinder below, but to determine whether urging of the opposite merits determination was substantially justified.

*Pierce v. Underwood,* 487 U.S. 552, 560 (1988). It saves the citizens of Wisconsin time and money for us to apply the clearly erroneous standard to the circuit court's findings, even when they are based solely on documentary evidence. We acknowledge the value inherent in this efficient use of judicial resources.

[11] The Honorable Michael P. Sullivan presided before the case was transferred to the Honorable John A. Franke.

statutory health care provider. Therefore, under the facts of this case Lindemann is an employee of a health care provider only if he was a borrowed employee of St. Joseph's[12] at the time of the Phelpses' injuries.[13]

¶ 41. We determine whether Lindemann was a borrowed employee of St. Joseph's by answering the following questions:

(1) Did the employee actually or impliedly consent to work for a special employer? (2) Whose was the work he was performing at the time of injury? (3) Whose was the right to control the details of the work being performed? (4) For whose benefit primarily was the work being done?

*Seaman,* 204 Wis. at 163.

1. Employee consent

■

¶ 42. In regard to the first question posed by the *Seaman* test, whether Lindemann actually or impliedly consented to work for St. Joseph's, the circuit court made the following finding of fact:

---

[12] Ironically, the Phelpses had initially argued that Lindemann was an employee of St. Joseph's, in order to hold the hospital liable under the doctrine of respondeat superior. They dropped this argument after St. Joseph's settled their claims. The Phelpses now have adopted a somewhat contradictory position, arguing that Lindemann was not a *borrowed* employee of St. Joseph's, in order to avoid having Gregory's claim brought under the provisions of Wis. Stat. ch. 655.

[13] In 2005, the legislature enacted Wis. Stat. § 655.002(2)(c) (2005–06), which permits graduate medical education programs, such as the one operated by the Affiliated Hospitals entity, to opt into the provisions of Wis. Stat. ch. 655. The Affiliated Hospitals entity has since taken that step.

> I find that Doctor Lindemann clearly consented to work for St. Joseph's Hospital. I'm not sure how long he was there for but he went to work there and was in any reasonable sense of the phrase working for the hospital. That's embodied in another subsequent finding perhaps, but in terms of his consent, he clearly consented to this both by engaging in the trainee program and in responding to the particular assignment to St. Joseph's. That's what he was going there to do. [The Affiliated Hospitals entity] had no direct interest in serving the patients of St. Joseph's, other than that it would provide a training opportunity for medical students or medical residents.

This finding is not "against the great weight and clear preponderance of the evidence." *Arias,* 311 Wis. 2d 358, ¶ 12 (quoting *Sykes,* 279 Wis. 2d 741, ¶ 21 n.7). It is difficult to imagine how Lindemann could not have consented to work for St. Joseph's when everything that he did took place there in furtherance of St. Joseph's purposes.

██

¶ 43. However, the court of appeals made a contrary finding of fact, asserting "[t]here is no evidence that Dr. Lindemann left [the Affiliated Hospitals entity]'s employment and agreed to become a St. Joseph's employee." *Phelps III,* 307 Wis. 2d 184, ¶ 31. The court of appeals' factual finding contradicts the circuit court's finding of fact that Lindemann consented to work for St. Joseph's, which finding of the circuit court can be overturned only if it was clearly erroneous. As quoted above from the circuit court's finding, there was sufficient evidence in the record from which the circuit court could properly find that Lindemann had consented to work for St. Joseph's. Furthermore, it is not necessary, as the court of appeals erroneously

27

assumed, that a borrowed employee leave the employ of his or her general employer in order to become the borrowed employee of another. *DePratt v. Sergio,* 102 Wis. 2d 141, 142 306 N.W.2d 62 (1981).[14] An employee can remain in the employ of both employers. *Id.*

¶ 44. When the Phelpses moved for reconsideration of the circuit court's finding on this point, while still before the circuit court, they argued that there could be no consent because there was no express contract between Lindemann and St. Joseph's. However, there is no requirement of an express contract between a borrowed employee and a borrowing employer. *Seaman,* 204 Wis. at 163. As we stated in *Seaman,* the question is, "Did the employee actually or impliedly consent to work for a special employer?" *Id.* The circuit court recognized this distinction:

> While in some respects Lindemann remained an employee of [the Affiliated Hospitals entity], I found that he consented, perhaps not expressly but certainly quite clearly, to also become an employee of St. Joseph's Hospital.

¶ 45. Furthermore, although there may not have been an express agreement between Lindemann and St. Joseph's, there was an express agreement between the Affiliated Hospitals entity and St. Joseph's. "[T]he existence of an arrangement or understanding between a general employer and a borrowing employer is relevant to the issue of an employee's consent to enter into a new employment relationship with the borrowing employer." *Borneman v. Corwyn Transp., Ltd.,* 219 Wis. 2d

---

[14] *See* further discussion of *DePratt v. Sergio,* 102 Wis. 2d 141, 306 N.W.2d 62 (1981), at ¶ 53 *infra.*

346, 360, 580 N.W.2d 253 (1998). Therefore, this agreement further supports the circuit court's finding that Lindemann consented to work for St. Joseph's, which finding is not clearly erroneous.

2. Work performed

¶ 46. In regard to the second question posed by the *Seaman* test, whether Lindemann was performing St. Joseph's work at the time of injury, the circuit court explained, "I find that [Lindemann] did actually enter[] upon the work of St. Joseph's Hospital . . . . [T]here was an implied contract for [Lindemann] to do certain things at St. Joseph's day after day on a full-time basis."

¶ 47. The court of appeals made a contrary finding of fact here too, i.e., that Lindemann did not perform the work of St. Joseph's, because "Dr. Lindemann provided medical services similar to those provided by private physicians who are not St. Joseph's employees." *Phelps III*, 307 Wis. 2d 184, ¶ 31. Again, this finding of fact stems from the court of appeals' erroneous decision to independently make findings of fact, rather than reviewing the circuit court's findings to determine whether the circuit court's findings were clearly erroneous.

¶ 48. Here, applying the correct standard of review, we conclude that the circuit court's factual finding, that Lindemann performed the work of St. Joseph's, is not clearly erroneous. Lindemann was an unlicensed first-year medical resident. He was not authorized to work at any location other than St. Joseph's. While at St. Joseph's, Lindemann cared for patients admitted to St. Joseph's. St. Joseph's purpose for existence was to treat the patients admitted to its

facility. Because Lindemann assisted St. Joseph's in fulfilling its health care purpose by caring for St. Joseph's patients, the circuit court's finding that Lindemann was doing the work of St. Joseph's is not "against the great weight and clear preponderance of the evidence." *Arias*, 311 Wis. 2d 358, ¶ 12 (quoting *Sykes*, 279 Wis. 2d 742, ¶ 21 n.7). Accordingly, that finding of the circuit court is not clearly erroneous. *State v. Johnson*, 2004 WI 94, ¶ 10, 273 Wis. 2d 626, 681 N.W.2d 901 (explaining that a circuit court's findings of fact will be upheld unless they are clearly erroneous).

3. Right to control

¶ 49. In regard to whether St. Joseph's had the right to control the details of Lindemann's work, the circuit court found as follows:

> I find that St. Joseph's had primary control over the details of [Lindemann's] work to be performed and to determine how the work should be done. . . .
>
> I find that on any reasonable day-to-day basis in terms of hours and work to be performed and assignments that this was controlled by St. Joseph's Hospital. There's no evidence about any specific involvement by [the Affiliated Hospitals entity] in the day-to-day details of Lindemann's work. . . .
>
> The details of the work on a day-to-day basis were clearly controlled by St. Joseph's, at least that's the overwhelming inference that I have from what I have read, that [St. Joseph's] decided when and where he worked and what patients he was working with and what forms he would use and that sort of day-to-day business.

¶ 50. The court of appeals once again made a contrary finding, determining that St. Joseph's did not have the right to control the details of Lindemann's work:

> [The Affiliated Hospitals entity] directed which hospital Dr. Lindemann worked at and paid him. Dr. Lindemann and [the Affiliated Hospitals entity] had a written contract, and [the Affiliated Hospitals entity] had the sole right to terminate him. [The Affiliated Hospitals entity] never relinquished any control over Dr. Lindemann. Indeed, as noted, while at St. Joseph's no hospital employee supervised Dr. Lindemann, and Dr. Lindemann was never given a handbook or any rules setting out St. Joseph's procedures. Thus, the right to control Dr. Lindemann remained in the hands of [the Affiliated Hospitals entity]'s program director, [Affiliated Hospitals entity] senior residents and private physicians.

*Phelps III,* 307 Wis. 2d 184, ¶ 31. The court of appeals supported its finding by citing evidence in the record. However, this independent search of the record for evidence in support of a factual finding contrary to the circuit court's finding of fact is not the proper role of an appellate court.

¶ 51. Instead, under the proper standard of review, appellate courts are to uphold a circuit court's findings of fact unless those findings go "against the great weight and clear preponderance of the evidence." *Arias,* 311 Wis. 2d 358, ¶ 12 (quoting *Sykes,* 279 Wis. 2d 742, ¶ 21 n.7). Here, we once again conclude that the circuit court's finding of fact is not clearly erroneous. The record is replete with evidence that St.

Joseph's controlled the details of Lindemann's work. For example, Lindemann testified in his deposition as follows:

> [Phelpses' Attorney] While you were at St. Joseph's Hospital, was it your understanding you were required to comply with the policies and procedures of St. Joseph's Hospital in providing professional care and services to patients at St. Joseph's Hospital?
>
> [Lindemann] Yes.
>
> [Phelpses' Attorney] And did St. Joseph's Hospital have the right to control your day-to-day activities in terms of interaction with patients at St. Joseph's Hospital?
>
> [Lindemann] Yes.

In addition, Dr. Mahendr S. Kochar, Executive Director of the Affiliated Hospitals entity, stated in his affidavit:

> While [the Affiliated Hospitals entity] is the technical and legal employer of the residents, [the Affiliated Hospitals entity] has no responsibility for training or supervision and control of the residents at the various hospitals where they are placed. . . . [The Affiliated Hospitals entity] is, in essence a conduit to facilitate payments, and has no supervisory or control role over the residents.
>
> . . .
>
> [The Affiliated Hospitals entity] has no knowledge of the specific responsibilities of Dr. Lindemann or any other residents at various hospitals including St. Joseph's Hospital.

Finally, Patricia Kaldor (Kaldor), the president of St. Joseph's, testified in her deposition as follows:

> [Phelpses' Attorney] Are residents who work at St. Joseph's Hospital required to follow policies and procedures of St. Joseph's Hospital?
>
> [Kaldor] Yes.

32

In light of this evidence, we cannot conclude that the circuit court's finding is contrary to "the great weight and clear preponderance of the evidence." *Arias,* 311 Wis. 2d 358, ¶ 12 (quoting *Sykes,* 279 Wis. 2d 742, ¶ 21 n.7).

¶ 52. When the Phelpses moved for reconsideration of the circuit court's decision on the borrowed employee question, they argued that in order for a borrowing employer to control the details of the borrowed employee's performance, the loaning employer must relinquish full and exclusive control of the borrowed employee. *Edwards v. Cutler-Hammer, Inc.,* 272 Wis. 54, 64, 74 N.W.2d 606 (1956) ("If [the loaning master] can show that he has loaned the servant to another and surrendered to the borrower all direction and control over him, then the borrower becomes the master, who is alone liable for the acts of the servant." (quoting *Anderson v. Abramson,* 13 N.W.2d 315, 316 (Iowa 1944))). The circuit court responded as follows:

> The design of the residency program contemplated that the hospital would control the routine "details of [Lindemann's] work." It also contemplated that [the Affiliated Hospitals entity] would not control or supervise Lindemann's medical judgment. In an affidavit, the Executive Director of [the Affiliated Hospitals entity] assert[ed] that [the Affiliated Hospitals entity] ha[d] no responsibility for training or supervision and control of the residents or the various hospitals where they are placed. . . . According to the affidavit [of the Executive Director], a first year resident would be "under the supervision and control of the patient's attending physician." This evidence is not controverted in any material way, and it, perhaps along with other similar evidence, formed the basis on which Judge Sullivan dismissed [the Affiliated Hospitals entity] from this case, finding that it did not control Lindemann's performance as a physician.

¶ 53. In *DePratt,* we concluded that no finding that the general employer relinquished full and exclusive control over the borrowed employee under all circumstances is required in order for the borrowing employer to have the right to control the details of the work performed for the borrowing employer. *DePratt,* 102 Wis. 2d at 142. We explained:

> Under the borrowed servant rule, the borrowing master, not the loaning master, is liable for the negligent acts of a loaned servant if the loaned servant becomes the servant of the borrowing master[,] . . . even though the loaned servant remains in the employ of the loaning master and is acting within the scope of his employment with the loaning master.

*Id.* at 142. As the circuit court's discussion indicates, its finding that St. Joseph's had the right to control Lindemann's daily activities as he cared for St. Joseph's patients is supported by the record. The only employer who reasonably could be seen to have exercised control over the details of Lindemann's work was St. Joseph's. We therefore conclude that the circuit court's finding, that St. Joseph's had the right to control the details of Lindemann's work, is not clearly erroneous.

4. Primary benefit

¶ 54. In regard to whether Lindemann's work was performed for St. Joseph's primary benefit, the circuit court explained:

> I find that [Lindemann's work] was being done primarily for the benefit of St. Joseph's. Obviously any employee works for their own benefit. Obviously to the extent that [the Affiliated Hospitals entity] wanted to run a program and provide training opportunities, there was a benefit to [the Affiliated Hospitals entity].

But when one looks at the tasks and work performed by this person, that work was primarily for the benefit of St. Joseph's Hospital.

¶ 55. Once again, the court of appeals made a contrary finding of fact and asserted that Lindemann's work did not primarily benefit St. Joseph's because "Dr. Lindemann's services benefitted the patients of the hospital and the private physicians[;] most of all, Dr. Lindemann's work aided [the Affiliated Hospitals entity] in its mission to train first-year residents in order to become licensed physicians." *Phelps III,* 307 Wis. 2d 184, ¶ 31. This discussion fails to review the circuit court's finding of fact under the clearly erroneous standard, which, when applied, requires the reviewing court to uphold the circuit court's findings unless they go "against the great weight and clear preponderance of the evidence." *Arias,* 311 Wis. 2d 358, ¶ 12 (quoting *Sykes,* 279 Wis. 2d 742, ¶ 21 n.7).

¶ 56. Applying the correct standard of review, however, we once again conclude that the circuit court's finding is not clearly erroneous. We note that this factor, i.e., for whose benefit the work was primarily performed, is largely derivative of the other factual findings. Lindemann's conduct was controlled by St. Joseph's policies and procedures; he worked to carry out the very purpose of St. Joseph's existence; and his consent to work for St. Joseph's is apparent through his conduct. To say that Lindemann was not working for St. Joseph's primary benefit would be to say that no employee works for his or her employer's primary benefit. Therefore, the circuit court's finding of fact on this point does not go "against the great weight and

clear preponderance of the evidence." *Id.* (quoting *Sykes*, 279 Wis. 2d 742, ¶ 21 n.7). Accordingly, it is not clearly erroneous.

### 5. Conclusion

¶ 57. Because we have upheld all of the circuit court's findings of fact regarding whether Lindemann was a borrowed employee, we conclude that Lindemann was a borrowed employee, under the test established in *Seaman*. The circuit court's finding makes clear that, under the first factor, Lindemann consented to work for St. Joseph's. *Seaman*, 204 Wis. at 163. Under the second factor, the circuit court's finding demonstrates that Lindemann was performing the work of St. Joseph's at the time of the injury. *Id.* Under the third factor, St. Joseph's had the right to control the details of the work Lindemann performed. *Id.* Finally, Lindemann's work was performed primarily for the benefit of St. Joseph's, thereby satisfying the fourth *Seaman* factor. *Id.*

¶ 58. *Seaman* explains that when facts are found sufficient to satisfy the four factual parts of its test, the "relation of employer and employee exists as between a special employer to whom an employee is loaned." *Id.* Here, we conclude that sufficient facts were found by the circuit court for us to conclude, as a matter of law, that the relationship of borrowing employer and borrowed employee existed between St. Joseph's Hospital and Lindemann when the Phelpses' claims arose.

¶ 59. That the court of appeals reached a contrary result, *Phelps III,* 307 Wis. 2d 184, ¶ 31, stems from its failure to apply the appropriate standard of review to the circuit court's findings of fact and from its erroneous view that an employee must leave the employ of a

general employer before that employee could become the employee of a borrowing employer.

¶ 60. Because Lindemann was St. Joseph's borrowed employee, "[t]he relation of employer and employee exist[ed]" between Lindemann and St. Joseph's, *Seaman,* 204 Wis. at 163, and accordingly, Lindemann was an employee of a health care provider within the meaning of Wis. Stat. ch. 655 and Wis. Stat. § 893.55(4). As a result, Gregory's claim for bystander negligent infliction of emotional distress is subject to those statutory provisions.

## C. Effect of Wis. Stat. ch. 655

¶ 61. After we granted defendants' petition for review, we requested supplemental briefing from the parties to address whether Wis. Stat. ch. 655 bars claims brought by a bystander who claims that an employee of a health care provider, or the health care provider itself, negligently provided health care services to a relative of the bystander that caused emotional distress to the bystander.[15] Having concluded that Lindemann is an employee of a health care provider because

---

[15] We also asked the parties for supplemental briefing to address whether this issue had been waived. Without addressing the relative merits of the arguments for and against waiver, we conclude that we have the authority to address it. "This court has the discretion to review an issue that has been waived when it involves a question of law, has been briefed by the opposing parties, and is of sufficient public interest to merit a decision." *Gumz v. N. States Power Co.,* 2007 WI 135, ¶ 73, 305 Wis. 2d 263, 742 N.W.2d 271 (citing *Apex Elecs. Corp. v. Gee,* 217 Wis. 2d 378, 384, 577 N.W.2d 23 (1998)). Whether Wis. Stat. ch. 655 bars claims against health care providers and their employees for bystander negligent infliction of emotional distress *is* purely a question of law; it has been briefed by both parties; and

he is a borrowed employee of St. Joseph's, the answer to this question is dispositive in our determination of whether Gregory's claim is actionable under Wisconsin law.[16]

¶ 62. We had the opportunity to address this very question in *Finnegan,* but a majority of the court could not agree. *See Finnegan v. Patients Comp. Fund,* 2003 WI 98, ¶ 2, 263 Wis. 2d 574, 666 N.W.2d 797 (lead opinion of Sykes, J.). Today, we expressly adopt Justice Sykes' lead opinion in *Finnegan,* and hold that Wis. Stat. ch. 655 does not permit bystander claims for negligent infliction of emotional distress arising from medical malpractice of health care providers and their employees. As Justice Sykes noted:

> [N]either Wis. Stat. § 655.005 nor Wis. Stat. § 655.007 specifically describes a [bystander] type claim for emotional distress or confers standing on a bystander to bring such a claim in a medical malpractice lawsuit.

we conclude that it is of considerable public interest. *See Finnegan,* 263 Wis. 2d 574, ¶¶ 16–18 (lead opinion of Sykes, J.).

[16] In the same way that Wis. Stat. § 893.55(4)'s caps on noneconomic damages apply where the claims are brought against "health care providers and all employes of health care providers," *see supra* note 4, the claims for which Wis. Stat. ch. 655 applies are those brought against health care providers and employees of health care providers. Wis. Stat. § 655.005(1) ("Any person listed in s. 655.007 having a claim or a derivative claim against a health care provider or an employe of the health care provider, for damages for bodily injury or death due to acts or omissions of the employe of the health care provider acting within the scope of his or her employment and providing health care services, is subject to this chapter.") Since Lindemann is a borrowed employee of St. Joseph's, and therefore an employee of a health care provider, ch. 655 applies to Gregory's claim under § 655.005(1).

Section 655.005(1) refers to all claims or derivative claims "for damages for bodily injury or death," and Wis. Stat. § 655.007 refers to the claims of patients and the derivative claims of specified relatives "for injury or death on account of malpractice." Emotional distress claims arising from witnessing an injury-causing event as a related bystander constitute an entirely different class of claim and are not mentioned.

The statutes specify that a relative's claim must be derivative to fall within the scope of allowable medical malpractice recovery, and only certain relatives are included. *See* Wis. Stat. § 655.007 ("[A]ny spouse, parent, minor sibling or child of the patient having a derivative claim for injury or death on account of malpractice is subject to this chapter."); Wis. Stat. § 655.005(1) ("Any person listed in s. 655.007 having a claim or a derivative claim against a health care provider . . . is subject to this chapter."). Our jurisprudence outlines the types of claims that are considered derivative. Claims for the loss of society, companionship, and consortium are derivative even though they technically "belong" to the close relative making the claim. *Korth v. Am. Family Ins. Co.*, 115 Wis. 2d 326, 331, 340 N.W.2d 494 (1983) (a parent's claim for loss of society and companionship with a child is derivative); *Peeples v. Sargent*, 77 Wis. 2d 612, 643, 253 N.W.2d 459 (1977) ([A] claim for loss of consortium is [a] derivative personal injury right which does not pass to [the] bankruptcy trustee[.]); *Richie v. Am. Family Mut. Ins. Co.*, 140 Wis. 2d 51, 56, 409 N.W.2d 146 (Ct. App. 1987) ([A] claim for loss of consortium is derivative in that "it derives from physical or mental injuries suffered by a family member.").

*Id.*, ¶¶ 25–26 (lead opinion of Sykes, J.).

¶ 63. The lead opinion in *Finnegan* explained that a claim for the negligent infliction of emotional distress to a bystander is a direct, not a derivative, claim,

because such a claim "does not depend on the primary tort victim's ability to make the claim." *Id.*, ¶ 27. Stated otherwise, a derivative claim arises from the tort injury to another; it does not have its own elements of proof that are distinct from the negligence claim to which it attaches; and it must be joined in the same action that brings the primary personal injury claim. *Id.*, ¶ 28. By contrast, a claim of bystander emotional distress has elements that, while arising from the underlying negligence, are distinct and subject to separate proof. *Bowen v. Lumbermens Mut. Cas. Co.*, 183 Wis. 2d 627, 657–58, 517 N.W.2d 432 (1994). As Justice Sykes explained:

> [A] claim for negligent infliction of emotional distress is not considered derivative; although it arises from a shared set of underlying facts, as do loss of society, companionship, or consortium claims[. N]egligent infliction of emotional distress is an independent tort injury suffered by the bystander himself or herself as a result of the shock of having witnessed an extraordinary and traumatic event. [*Bowen v. Lumbermens Mut. Cas. Co.*, 183 Wis. 2d 627, 657–58, 517 N.W.2d 432 (1994)]. . . . A [bystander] claim for negligent infliction of emotional distress does not depend on the primary tort victim's ability to make the claim.
>
> A plaintiff who sues for negligent infliction of emotional distress . . . is asserting that he or she has been the victim of an independent tort, not that he or she has a separate but dependent damages claim deriving from a tort injury to another, as in a derivative claim such as loss of consortium or society and companionship. . . . Unlike a . . . bystander claim, a derivative claim for loss of consortium or loss of society and companionship does not have its own elements distinct from the negligence claim to which it attaches; juries are instructed that loss of consortium or loss of society and companionship are categories of damages, not separate negligence inquiries. . . .

*Finnegan,* 263 Wis. 2d 574, ¶¶ 27–28 (lead opinion of Sykes, J.).

¶ 64. "Chapter 655 constitutes the exclusive procedure and remedy for medical malpractice in Wisconsin" against health care providers, as that term is defined in Wis. Stat. § 655.001(8), and their employees. *Id.,* ¶ 22 (lead opinion of Sykes, J.) (citing *Czapinski v. St. Francis Hosp., Inc.,* 2000 WI 80, ¶ 14, 236 Wis. 2d 316, 613 N.W.2d 120; *Rineck v. Johnson,* 155 Wis. 2d 659, 665, 456 N.W.2d 336 (1990); *State ex rel. Strykowski v. Wilkie,* 81 Wis. 2d 491, 499, 261 N.W.2d 434; *Ziulkowski v. Nierengarten,* 210 Wis. 2d 98, 102, 565 N.W.2d 164 (Ct. App. 1997)). Chapter 655 does not permit claims other than those listed in Wis. Stat. §§ 655.005(1) and 655.007. *Id.,* ¶ 30 (lead opinion of Sykes, J.). Bystander claims for negligent infliction of emotional distress asserted against health care providers or employees of health care providers arising from alleged medical malpractice are governed by ch. 655. *Id.* They are not derivative claims, and are not among the claims listed in §§ 655.005(1) and 655.007. *Id.*

¶ 65. As Justice Sykes explained:

> Because Chapter 655 exclusively governs all claims arising out of medical malpractice [against health care providers and their employees], and because the legislature did not include [bystander] claims in Wis. Stat. §§ 655.005(1) or 655.007, . . . negligent infliction of emotional distress claims arising out of medical malpractice are not actionable under Wisconsin law.

*Id.*

¶ 66. Lindemann was a borrowed employee of St. Joseph's; therefore, he was an employee of a health care

provider. Gregory's claim arises from alleged medical malpractice; therefore, Wis. Stat. ch. 655 applies to Gregory's claim. Because Gregory's claim is one for bystander negligent infliction of emotional distress and ch. 655 does not permit such claims, Gregory's claim is not recognized by Wisconsin law. We therefore reverse the decision of the court of appeals, and remand to the circuit court to issue an order dismissing Gregory's claim.[17]

## III. CONCLUSION

¶ 67. We conclude that Lindemann was a borrowed employee of St. Joseph's, and was therefore an employee of a health care provider under ch. 655. As a result, ch. 655 governs Gregory's claim. We further conclude that ch. 655 does not permit claims arising

---

[17] Lindemann and Physicians also argue that the record is insufficient to support Gregory's claim for bystander negligent infliction of emotional distress under the majority rationale in *Finnegan.* The Phelpses disagree, and further argue that this argument has been waived. In *Finnegan,* we concluded that even if Wis. Stat. ch. 655 permitted bystander claims, "[t]he hallmark of negligent infliction of emotional distress is a contemporaneous or nearly contemporaneous sensory perception of a sudden, traumatic, injury-producing event." *Finnegan,* 263 Wis. 2d 574, ¶ 54. Lindemann argues that the Phelpses did not witness the injury-producing event, and accordingly, his conduct cannot form the basis for Gregory's claim. Because we conclude that ch. 655 precludes Gregory's claim, and this conclusion is dispositive, we do not reach this alternative argument or the Phelpses' responses to it. *Walgreen Co. v. City of Madison,* 2008 WI 80, ¶ 2, 311 Wis. 2d 158, 752 N.W.2d 687 (noting that when resolution of one issue is dispositive, we need not reach other issues raised by the parties); *Jankee v. Clark County,* 2000 WI 64, ¶ 105, 235 Wis. 2d 700, 612 N.W.2d 297 (same).

from medical negligence other than those listed in Wis. Stat. §§ 655.005(1) and 655.007, and the negligent infliction of emotional distress to a bystander is not one of those claims. Therefore, Gregory's claim is not actionable under Wisconsin law. Accordingly, we reverse the decision of the court of appeals, and remand the cause to the circuit court to issue an order dismissing Gregory's claim.

*By the Court.*—The decision of the court of appeals is reversed, and the cause is remanded to the circuit court.

¶ 68. ANN WALSH BRADLEY, J. (*dissenting*). Appellate standards of review define the roles of appellate courts and are often outcome determinative. Here, by applying an incorrect standard of review, the majority reaches an erroneous conclusion.

¶ 69. I write separately because (1) the majority fails to apply the correct appellate standard for review of a paper record; (2) it erroneously concludes that Dr. Lindemann was a borrowed employee; (3) unlike the majority, I conclude that Wis. Stat. ch. 655 does not bar Gregory Phelps' bystander claim for negligent infliction of emotional distress. Accordingly, I respectfully dissent.

I

¶ 70. The majority correctly explains the usual standard for reviewing a circuit court's decision: The circuit court's findings of facts are upheld unless they are clearly erroneous, but the application of the test to the facts presents a question of law which this court reviews independently.

¶ 71. Nevertheless, the usual clearly erroneous standard for reviewing a circuit court's factual findings

does not apply in this case. Here, the circuit court judge who made the factual findings on review was not the same judge to preside over the earlier proceedings. Although this court had remanded for additional fact finding, the parties elected to have the circuit court judge decide the borrowed servant issue on the basis of the paper record without taking additional testimony.

¶ 72. The basis for deferring to a circuit court's factual findings disappears when the circuit court does not see or hear witnesses' testimony. *Vogt, Inc. v. Int'l Bhd. Teamsters,* 270 Wis. 315, 71 N.W.2d 359 (1955), on reargument, 270 Wis. 321b, 321i, 74 N.W.2d 749 (1956). Numerous Wisconsin cases have recognized that when a circuit court's inferences and findings of fact are based solely on a paper record rather than on an evaluation of oral testimony, an appellate court does not apply the clearly erroneous standard of review to the circuit court's factual findings.[1] This exception to the usual rule is called the documentary exception.

---

[1] *See, e.g., State v. Williams,* 2002 WI 1, ¶ 34–35, 249 Wis. 2d 492, 637 N.W.2d 733 (interpreting a prosecutor's comments at a sentencing hearing independently of the circuit court because the circuit court did not "base its interpretation of the prosecutor's comments on its recollection of the sentencing hearing, which would have included memories of voice inflections, observed facial expressions, and pauses in the testimony," but rather "interpreted the prosecutor's comments by reading the written record of the plea and sentencing hearings"); *Lambrecht v. Kaczmarczyk,* 2001 WI 25, ¶ 27, 241 Wis. 2d 804, 623 N.W.2d 751 ("This court and the circuit court are equally able to read the written record."); *Cohn v. Town of Randall,* 2001 WI App 176, ¶ 7, 247 Wis. 2d 118, 633 N.W.2d 674 ("We are in just as good a position as the trial court to make factual inferences based on documentary evidence and we need not defer to the trial court's findings."); *Racine Educ. Ass'n v. Bd. Educ.,* 145 Wis. 2d 518, 521, 427 N.W.2d 414 (Ct. App. 1988) ("When the evidence to be considered is documentary, as it is

¶ 73. Court of Appeals Judge Thomas Cane and Attorney Kevin M. Long have written a law review article criticizing the documentary exception. *See* Hon. Thomas Cane & Kevin M. Long, *Shifting the Main Event: The Documentary Evidence Exception Improperly Converts the Appellate Courts into Fact-Finding Tribunals,* 77 Marq. L. Rev. 475 (1993–94). However, these authors recognize that the documentary exception is the law in Wisconsin. *See id.* at 475–76.

here, we need not give any special deference to the trial court's findings. Our review becomes de novo."); *Pfeifer v. World Serv. Life Ins. Co.,* 121 Wis. 2d 567, 571 n.1, 360 N.W.2d 65 (Ct. App. 1984); (explaining that when evidence is documentary, a reviewing court is not bound by inferences drawn by the fact finder); *State ex rel. Sieloff v. Golz,* 80 Wis. 2d 225, 241, 258 N.W.2d 700 (1977) ("[W]hen the evidence to be considered is documentary, a reviewing court is not bound by any inferences that may have been drawn by the factfinder and, therefore, need not afford a trial court's findings any special deference."); *Vogt, Inc. v. Int'l Bhd. Teamsters,* 270 Wis. 315, 71 N.W.2d 359 (1955), on reargument, 270 Wis. 321b, 321i, 74 N.W.2d 749 (1956) ("[The reason for the clearly erroneous standard is that the] appellate court must give weight to the findings of a trial court made in a contested matter upon oral testimony where the trial judge is in a position to pass on the credibility of the witnesses and the weight to be given to their testimony. He has full opportunity to observe the demeanor of the witnesses and judge their veracity—the appellate court does not. The reason for the rule disappears, however, when the appeal is presented upon no more than pleadings and affidavits, as is the case here.").

The majority asserts that the law is in conflict regarding the standard for reviewing a circuit court's factual findings and inferences based on a documentary record. *See* majority op., ¶ 38 n.10. It contends that *Pfeifer,* a court of appeals decision, demonstrates this conflict. *Pfeifer* does not support the majority's position. It cited *Golz* with approval and rejected the clearly erroneous standard applied by the majority today. *See* 121 Wis. 2d at 570, 571 n.1.

45

¶ 74. Nevertheless, the majority ignores this long line of precedent, overruling it sub silencio and without explanation. What ever happened to stare decisis?

¶ 75. The majority's mistake in selecting the wrong standard of review is exacerbated by its application of that standard. It confuses facts and law throughout its analysis of the borrowed employee issue. It correctly recognizes that when matters of historical and evidentiary fact are undisputed or have been found by the court, "application of the *Seaman* test to those facts is a question of law" that this court reviews independently. *See* majority op., ¶ 35.

¶ 76. Although the majority insists that the underlying facts are disputed, majority op., ¶ 38 n.10, a close look at the majority's analysis reveals that what is really disputed are the legal consequences of the facts.[2] The majority erroneously treats each element of the *Seaman*[3] test as a question of fact and defers to the circuit court's "findings" regarding each element.[4]

---

[2] For instance, the parties agree that there was a written employment agreement between MCWAH and Dr. Lindemann; that Dr. Lindemann never signed an employment agreement with St. Joseph's; that he received a paycheck and W-2 form from MCWAH; that St. Joseph's reimbursed MCWAH for the salary it paid to its residents; and that Dr. Lindemann was supervised and evaluated by program directors, who are officers of MCWAH. The essence of the dispute is whether these facts establish that St. Joseph had the right of control over Dr. Lindemann.

[3] *Seaman Body Corp. v. Indus. Comm'n of Wisconsin*, 204 Wis. 157, 235 N.W. 433 (1931).

[4] *See* majority op., ¶ 44 (deferring to the circuit court's "finding" that Lindemann consented to work for St. Joseph's); *id.*, ¶ 46 (deferring to the circuit court's "finding" that Lindemann was doing the work of St. Joseph's); *id.*, ¶ 51 (deferring to

46

¶ 77. As a result, the majority erroneously treats the circuit court's ultimate determination of law regarding the *Seaman* test as factual determinations that an appellate court must uphold unless clearly erroneous: "Because we have upheld all of the circuit court's findings of fact regarding whether Lindemann was a borrowed employee, we conclude that Lindemann was a borrowed employee[.]" Majority op., ¶ 57. This conclusion conflicts with the majority's earlier statement that application of the borrowed servant test presents a question of law for this court to decide independently.

II

¶ 78. I turn next to the question of whether Dr. Lindemann was a borrowed employee of St. Joseph's hospital. In order to reach the result that Dr. Lindemann was a borrowed employee, the majority necessarily had to apply the clearly erroneous standard to the circuit court's conclusions of law. By contrast, the court of appeals persuasively marshaled the evidence, applied the *Seaman* test to the facts, and ultimately concluded that Dr. Lindemann was not a borrowed employee.

¶ 79. Because we have stated that consent is "the most critical inquiry in the *Seaman* test," *Borneman v. Corwyn Transport, Ltd.*, 219 Wis. 2d 346, 356, 580 N.W.2d 253 (1998), I begin with an examination of the consent factor. The court of appeals determined that the most persuasive evidence regarding the consent factor was "Dr. Lindemann's own testimony and the admissions of St. Joseph's Hospital." *Phelps v. Physi-*

the circuit court's "finding . . . that St. Joseph's controlled the details of Lindemann's work"); *id.*, ¶ 56 (deferring to the circuit court's "finding" that Lindemann's work was performed for St. Joseph's primary benefit).

47

*cians Ins. Co. Wis.,* 2008 WI App 6, ¶ 25, 307 Wis. 2d 184, 744 N.W.2d 880. In response to requests for admission, "St. Joseph's denied being Dr. Lindemann's employer, denied having the right to control or supervise Dr. Lindemann and denied being legally responsible for Dr. Lindemann's health care services." *Id.*

¶ 80. The court of appeals concluded that these admissions, "[c]oupled with the presumption that in the absence of evidence to the contrary, the actor remains in his or her general employment, there appears to be little doubt that Dr. Lindemann remained an employee of MCWAH." *Id.* (internal quotations and citations omitted). By contrast, the majority opinion simply opines "[i]t is difficult to imagine how Lindemann could not have consented to work for St. Joseph's when everything that he did took place there in furtherance of St. Joseph's purposes." Majority op., ¶ 42.

¶ 81. With regard to the work performed factor, the court must determine whether there was "[a]ctual entry by the employee upon the work of and for the special employer pursuant to an express or implied contract so to do." *Borneman,* 219 Wis. 2d at 353. The court of appeals explained that not every private physician who sees hospitalized patients becomes an employee of the hospital and that St. Joseph's did not choose to make residents employees. Rather, St. Joseph's contracted with MCWAH and its program director, who paid, assigned, and evaluated residents. *Phelps,* 307 Wis. 2d 184, ¶ 27. The majority, however, merely concludes that "Lindemann assisted St. Joseph's in fulfilling its health care purpose by caring for St. Joseph's patients[.]" Majority op., ¶ 48.

¶ 82. With regard to the right to control, the court of appeals concluded that St. Joseph's did not control the details of Dr. Lindemann's work. *Phelps,* 307

48

Wis. 2d 184, ¶ 28. The court of appeals based its determination, in part, on the undisputed fact that Dr. Lindemann's supervisors were doctors associated with the MCWAH rather than employees of St. Joseph's. *Id.*

¶ 83. I need go no further to analyze the *Seaman* factors. It is clear that the court of appeals got it right and that the *Seaman* test has not been met. I agree with the following conclusion of the court of appeals:

> In sum, after addressing the *Seaman* factors for a "borrowed employee," we conclude that the test has not been met. There is no evidence that Dr. Lindemann left MCWAH's employment and agreed to become a St. Joseph's employee. Dr. Lindemann provided medical services similar to those provided by private physicians who are not St. Joseph's employees. MCWAH directed which hospital Dr. Lindemann worked at and paid him. Dr. Lindemann and MCWAH had a written contract, and MCWAH had the sole right to terminate him. MCWAH never relinquished any control over Dr. Lindemann. Indeed, as noted, while at St. Joseph's no hospital employee supervised Dr. Lindemann, and Dr. Lindemann was never given a handbook or any rules setting out St. Joseph's procedures. Thus, the right to control Dr. Lindemann remained in the hands of MCWAH's program director, MCWAH senior residents and private physicians. Finally, Dr. Lindemann's services benefitted the patients of the hospital and the private physicians but most of all, Dr. Lindemann's work aided MCWAH in its mission to train first-year residents in order to become licensed physicians. Therefore, Dr. Lindemann was not a "borrowed employee."

*Id.,* ¶ 31.

### III

¶ 84. I turn now to the majority opinion's conclusion that Wis. Stats. ch. 655 bars bystander claims for negligent infliction of emotional distress.

¶ 85. In *Finnegan v. Wis. Patients Comp. Fund,* 2003 WI 98, ¶¶ 40, 43–50, 263 Wis. 2d 574, 666 N.W.2d 797, I did not take a position on whether a parent's claim of negligent infliction of emotional distress resulting from medical malpractice is an independent cause of action or a derivative cause of action and whether under either analysis the claim can be brought within or outside chapter 655.

¶ 86. On rereading the *Finnegan* concurrence authored by Chief Justice Abrahamson[5] and the *Finnegan* dissent authored by Justice Bablitch and joined by Justice Crooks,[6] I am persuaded that either reasoning is reasonable and a cause of action exists for negligent infliction of emotional distress resulting from medical malpractice.

¶ 87. This is a bystander case and a tortfeasor's liability is governed by *Bowen v. Lumbermens Mutual Casualty Co.,* 183 Wis. 2d 627, 517 N.W.2d 432 (1994). In *Bowen* this court set forth three factors for determining whether a plaintiff could recover on his or her bystander claim for negligent infliction of emotional distress: (1) "the injury suffered by the victim must have been fatal or severe"; (2) "the victim and the plaintiff must be related as spouses, parent-child, grandparent-grandchild or siblings"; and (3) "the plaintiff must have observed an extraordinary event, namely the incident and injury or the scene soon after the incident with the injured victim at the scene." *Id.* at 633.

¶ 88. In bystander cases, a court rules on these factors on a case-by-case basis. The parties dispute

---

[5] *Finnegan v. Wisconsin Patients Comp. Fund,* 2003 WI 98, ¶¶ 43–50, 263 Wis. 2d 574, 666 N.W.2d 797.

[6] *Id.,* ¶¶ 64–74.

whether the instant case satisfies the third factor. I conclude, as did the circuit court, that it does.

¶ 89. In *Finnegan,* 263 Wis. 2d 574, ¶ 54, the majority declared that the "hallmark of negligent infliction of emotional distress is a contemporaneous or nearly contemporaneous sensory perception of a sudden, traumatic, injury-producing event." Gregory Phelps arrived on the scene soon after Lindemann's negligence became causal of Adam's injuries. Phelps witnessed the spontaneous delivery of Adam. He witnessed the injuries and death of his son. I conclude that Phelps had a first-hand observation of the traumatic, injury-producing event.

¶ 90. For the reasons set forth above, I respectfully dissent.

¶ 91. I am authorized to state that Chief Justice SHIRLEY S. ABRAHAMSON joins this dissent.