**COURT OF APPEALS
DECISION
DATED AND FILED**

**July 18, 2023**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2022AP1234**

Cir. Ct. No. **2020PR3**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT III

IN RE THE ESTATE OF MARTIN ZOLONDICK:

MARY TAPS,

APPELLANT,

V.

THE ESTATE OF MARTIN ZOLONDICK,

RESPONDENT,

ALLY BANK,

CREDITOR-RESPONDENT.

APPEAL from a judgment of the circuit court for Marinette County: JANE M. SEQUIN, Judge. *Affirmed in part; reversed in part and cause remanded with directions.*

Before Stark, P.J., Hruz and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. At the time of his death, Martin Zolondick[1] owned checking and savings accounts at Ally Bank ("Ally"), along with a large number of certificate of deposit ("CD") accounts. Following Martin's death, Ally transferred approximately $256,000 from those accounts to Mary Taps, consistent with the beneficiary designations shown in Ally's internal records. Martin's estate ("the Estate") subsequently challenged the distributions to Taps, and the circuit court concluded that the funds in question should be remitted to the Estate.

¶2 Taps now appeals, arguing that the circuit court erred by concluding that the funds in question were not controlled by a "governing instrument," as that term is defined in WIS. STAT. § 854.01(2) (2021-22).[2] Taps further argues that the relevant governing instruments "effectively dispose[d] of" the funds in Martin's accounts because there is competent evidence showing that Martin intended that money to be distributed to Taps upon his death. *See* WIS. STAT. § 854.07(3). Accordingly, Taps asserts that Ally properly distributed the funds to her.

¶3 We conclude that the circuit court erred with respect to Martin's checking and savings accounts. Those accounts were subject to governing instruments, as there is competent evidence that Martin intended to create payable on death ("POD") accounts. Furthermore, the governing instruments effectively

---

[1] For clarity and ease of reading, after our initial references to Martin Zolondick and his family members, we will refer to them by their first names.

[2] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

disposed of the funds in the checking and savings accounts because there is competent evidence that Martin intended the money to be distributed to Taps following his death. We therefore reverse that portion of the court's judgment requiring the funds from the checking and savings accounts to be remitted to the Estate. We remand for the court to determine the amount of money to which Taps is entitled from those accounts and to award Taps that amount.

¶4 With respect to Martin's CD accounts, we assume, without deciding, that the funds in those accounts were subject to governing instruments. We conclude, however, that the circuit court properly determined there was no competent evidence of Martin's intent regarding the disposition of the funds in the CD accounts. Consequently, the relevant governing instruments did not "effectively dispose of" the funds in the CD accounts. *See id.* We therefore affirm that portion of the court's judgment requiring the funds from the CD accounts to be remitted to the Estate.

## BACKGROUND

¶5 Martin died intestate on December 25, 2019. He was survived by his three children—Adrienne Zolondick, Steven Zolondick, and Karen Granger. Martin was also survived by Taps, who was his girlfriend and had lived with him for approximately thirty-eight years.

¶6 At the time of his death, Martin owned 333 CDs (each in the principal amount of $1,000), a checking account, and a savings account at Ally, an online bank. It is undisputed that at the time of Martin's death, Taps was listed in Ally's internal records as the sole POD beneficiary for the checking account, the savings account, and 228 of the CDs. It is further undisputed that Ally's records

listed six POD beneficiaries for each of the remaining 105 CDs: Taps, Adrienne, Steven, Karen, and Martin's grandchildren Tayla Zolondick[3] and Ari Zolondick.

¶7 Following Martin's death, Ally distributed $256,426.77 from his accounts to Taps. Taps then invested that money in four CDs at Ally. Ally distributed approximately $18,000 to each of the other five named beneficiaries of Martin's accounts.

¶8 The Estate subsequently challenged Ally's distributions to Taps, filing a petition asking the circuit court to determine whether any person had "concealed, stolen, conveyed, or disposed of property of the estate."[4] *See* WIS. STAT. § 879.61. During the circuit court proceedings, the parties stipulated that Ally had distributed the funds from Martin's accounts in a manner consistent with the POD beneficiary designations shown in its internal records. The Estate argued, however, that the funds distributed to Taps were not controlled by any "governing instrument," as that term is defined in WIS. STAT. § 854.01(2), and were therefore subject to probate and should have been paid to the Estate. The Estate further argued that there was no "competent evidence" of Martin's intent regarding the disposition of the funds in his various Ally accounts.

¶9 Following an evidentiary hearing, the circuit court issued a written decision and order. The court made a number of factual findings, which are

---

[3] Throughout the appellate record, this individual's first name is variously spelled "Tayla," "Talya," and "Talia." The parties do not dispute that these spellings all refer to the same individual, who is one of Martin's grandchildren. Following the circuit court's lead, we will refer to this individual as "Tayla," which reflects the spelling that Martin provided to an Ally representative during a recorded January 12, 2019 phone call.

[4] The Estate did not challenge Ally's distributions to Martin's children and grandchildren.

discussed in greater detail below. Based on those factual findings, the court concluded that the funds in Martin's Ally accounts were "not subject to a governing instrument as defined by" WIS. STAT. § 854.01(2). The court also agreed with the Estate that there was no "competent evidence" regarding Martin's intent as to the disposition of the funds in the Ally accounts. The court therefore ordered that the funds "shall be remitted to the Estate."

¶10     The circuit court subsequently entered a judgment reiterating that the "[f]unds currently being held by [Ally,] which reflect assets of [Martin] transferred to [Taps] by POD Designation, shall be remitted to the Estate." However, the court stayed the enforcement of its judgment pending the resolution of this appeal.

¶11     Additional facts are included below as relevant to our discussion of the parties' arguments.

## DISCUSSION

### I. Applicable legal principles

¶12     On appeal, we will uphold the circuit court's findings of fact unless they are clearly erroneous. *See* WIS. STAT. § 805.17(2). A finding of fact is clearly erroneous when it is against the great weight and clear preponderance of the evidence. *Phelps v. Physicians Ins. Co. of Wis.*, 2009 WI 74, ¶39, 319 Wis. 2d 1, 768 N.W.2d 615. Whether the facts fulfill a particular legal standard, however, is a question of law that we review independently. *"K" Care, Inc. v. Town of Lac du Flambeau*, 181 Wis. 2d 59, 65, 510 N.W.2d 697 (Ct. App. 1993).

¶13     In this appeal, the first question is whether the funds in Martin's Ally accounts were subject to governing instruments. It appears to be undisputed that, if the funds were not subject to governing instruments, they should have been

distributed to the Estate. The term "governing instrument" includes "an instrument under [WIS. STAT.] ch. 705." WIS. STAT. § 854.01(2). An instrument under ch. 705, in turn, includes a POD account. *See* WIS. STAT. § 705.02(1)(b).

¶14 Thus, to determine whether the funds in Martin's Ally accounts were subject to governing instruments, we must address whether Martin created valid POD accounts under Wisconsin law. Language "in substantially the following form" is effective to create a POD account "when conspicuously printed or typewritten immediately above or adjacent to the place for the signatures of the parties to the account:" "THIS ACCOUNT/CERTIFICATE OF DEPOSIT IS OWNED BY THE PARTY NAMED HEREON. UPON THE DEATH OF SUCH PARTY, OWNERSHIP PASSES TO THE P.O.D. BENEFICIARY(IES) NAMED HEREON." WIS. STAT. § 705.02(1)(b). Alternatively,

> [a]ny deposit made to an account created on or after July 1, 1975, and within the scope of this subchapter, which account is not evidenced by an agreement containing language in substantial conformity with this section … shall nonetheless be deemed to create … [a] P.O.D. relationship … in accordance with whatever competent evidence is available concerning the depositor's intent at the time the account was created.

Sec. 705.02(3).

¶15 If Martin did create valid POD accounts—that is, if governing instruments did control the disposition of the funds in Martin's accounts—then the next question is whether those governing instruments effectively disposed of the money in Martin's accounts. "If a governing instrument other than a will does not effectively dispose of an asset that is governed by the instrument, that asset shall be paid or distributed to the transferor's probate estate." WIS. STAT. § 854.07(3). The parties appear to agree that, in order to determine whether any governing

instruments in this case effectively disposed of the funds in Martin's accounts, we must decide whether there is competent evidence of Martin's intent regarding the beneficiary designations for his accounts. *See* WIS. STAT. § 705.02(3).

## II. Martin's checking and savings accounts

¶16    It is undisputed that Martin's checking and savings accounts at Ally were not evidenced by any provision in substantial conformity with the language set forth in WIS. STAT. § 705.02(1)(b). Nevertheless, a deposit made to those accounts on or after July 1, 1975, was sufficient to create a POD relationship "in accordance with whatever competent evidence is available concerning [Martin's] intent at the time the account was created." *See* § 705.02(3).

¶17    The parties agree that Ally's internal records show that Martin's checking and savings accounts were POD accounts. During the evidentiary hearing, Ally submitted Exhibits 1, 2, and 25. Jacqueline Lemma, a manager at Ally, testified that Exhibit 1 is the "full account history" for each of Martin's Ally accounts. Lemma testified that Exhibit 2 is a list of Martin's Ally accounts at the time of his death, with the account beneficiaries identified. Lemma explained that Exhibits 1 and 2 were created "to accurately identify the accounts that were still active at [Martin's] death and who the beneficiary was" for each account.

¶18    Lemma further testified that Exhibit 25 is a "screenshot" from Ally's internal system, which shows "the summary of the decedent's account[s] at the time of his death … as well as showing that all the accounts were listed as POD." Exhibit 25 also lists the beneficiaries for each account, as reflected in Ally's internal records.

¶19     Exhibit 1 shows that Martin's checking account was opened on February 17, 2016, and his savings account was opened on December 16, 2015. Exhibit 25 shows the same opening dates for both accounts and lists the account type for each as "Single with POD Beneficiary." Although Ally's internal records do not specifically indicate that the checking and savings accounts were designated as POD accounts on the dates they were opened, there is no evidence in the record to suggest that the checking and savings accounts were ever anything other than POD accounts.

¶20     More importantly, Exhibit 1 shows that Taps was named the sole beneficiary of Martin's checking account on March 19, 2018. Exhibit 1 also shows that Taps was named the sole beneficiary of Martin's savings account on May 24, 2016. Taps was subsequently removed as the beneficiary of Martin's savings account on August 11, 2017, but she was renamed the sole beneficiary of that account the same day. Martin's designation of Taps as the beneficiary for his checking and savings accounts provides competent evidence that he created POD accounts as of the dates the beneficiary designations were made, even if the accounts were not POD accounts when they were initially opened.

¶21     Moreover, the record contains a partial recording and transcript of a phone call that Martin made to Ally on January 12, 2019. We discuss this call in greater detail below, as it relates to our analysis of Martin's CD accounts. As relevant here, during the recorded portion of the January 12 call, Martin confirmed that Taps was to receive the funds from his checking and savings accounts following his death.

¶22     Taken together, the January 12 phone call and Ally's internal records provide competent evidence that Martin intended his checking and savings

accounts to be POD accounts. *See* WIS. STAT. § 705.02(3). Even if the checking and savings accounts were not initially POD accounts at the time they were opened, there is competent evidence that they were created as POD accounts on March 19, 2018, and May 24, 2016, respectively—the dates when Martin named Taps as the beneficiary of the accounts. Accordingly, we conclude that the checking and savings accounts were subject to governing instruments, as that term is used in WIS. STAT. § 854.01(2).

¶23 In arguing to the contrary, the Estate asserts that "Wisconsin law prefers written and signed governing instruments[,] and there is none here." We do not find this argument convincing. Although the law may favor governing instruments that are written and signed, WIS. STAT. § 854.01(2) expressly states that a "governing instrument" includes "an instrument under [WIS. STAT.] ch. 705." While WIS. STAT. § 705.02 prefers a written governing instrument that contains the recommended wording, § 705.02(3) also permits other evidence to support a conclusion that a POD account was created and intended. Section 705.02(3) does not require that evidence to be a written governing instrument.

¶24 The Estate also argues that Taps stipulated at trial that "Ally's internal computer records are not compliant with Wisconsin law or enforceable for designation of POD beneficiaries." According to the Estate, this stipulation "bars the argument that … Ally's records are governing instruments." This argument fails because the Estate misstates the terms of the parties' stipulation. The parties merely stipulated that Ally had distributed the funds from Martin's accounts in accordance with the beneficiary designations shown in its internal records. The Estate's counsel clarified that the Estate was not stipulating that Ally's internal records were compliant with Wisconsin law, but Taps never stipulated that Ally's

internal records were *not* compliant with Wisconsin law. Consequently, the stipulation does not bar Taps from arguing that Martin's checking and savings accounts were subject to governing instruments.

¶25 Having concluded that Martin's checking and savings accounts were subject to governing instruments, we must next consider whether the governing instruments effectively disposed of the funds in those accounts. *See* WIS. STAT. § 854.07(3). Taps argues that the governing instruments effectively disposed of the funds because there is competent evidence that Martin intended the funds to be distributed to Taps upon his death. *See* WIS. STAT. § 705.02(3). We agree.

¶26 As discussed above, Ally's records show that Taps was named the sole beneficiary of Martin's checking and savings accounts on March 19, 2018, and May 24, 2016, respectively. Although Taps was subsequently removed as the beneficiary of Martin's savings account on August 11, 2017, she was renamed the sole beneficiary of that account the same day. Ally's records do not reflect any subsequent changes to the beneficiary designations for Martin's checking and savings accounts. Exhibits 2 and 25 show that Taps remained the sole POD beneficiary of those accounts at the time of Martin's death.

¶27 Moreover, as noted above, Martin confirmed during the recorded portion of the January 12, 2019 phone call that he wanted the funds from his checking and savings accounts to go to Taps following his death. There is no evidence suggesting that Martin intended any other person to receive the funds from those accounts or that Martin did not intend Taps to receive that money. On this record, we agree with Taps that there is competent evidence Martin intended her to be the beneficiary of his checking and savings accounts. As such, the relevant governing instruments effectively disposed of the funds in those accounts.

¶28    The Estate argues that we cannot rely on Exhibits 1, 2, and 25 as competent evidence of Martin's intent because those documents were created by Ally following Martin's death, not "at the time the accounts were opened." We reject this argument because WIS. STAT. § 705.03(2) does not limit us to considering evidence that was in existence at the time an account was opened. Instead, we read that statute as allowing us to consider any competent evidence that bears on the owner's intent at the time the account was created as a POD account—irrespective of when the evidence came into existence.

¶29    Here, regardless of whether the checking and savings accounts were POD accounts at the time they were opened, Ally's records show that Martin named Taps as the sole POD beneficiary of the checking account on March 19, 2018, and of the savings account on May 24, 2016. Thus, even if the checking and savings accounts were not initially POD accounts, there is competent evidence that Martin created them as POD accounts as of those dates. Furthermore, there is competent evidence that Martin intended Taps to be the sole beneficiary from those dates onward. The fact that this evidence was not in existence at the time the accounts were opened is immaterial.

¶30    The Estate also cites our supreme court's decision in *Bruckner v. Prairie Federal Savings & Loan Ass'n*, 81 Wis. 2d 215, 260 N.W.2d 256 (1977), in support of its claim that there is no competent evidence regarding Martin's intent. The issue in *Bruckner* was whether there was "sufficient evidence to show that the decedent, John L. Bruckner, created a savings account with the Prairie du Chien Federal Savings and Loan Association payable on his death to Lee J. Bruckner, a nephew." *Id.* at 216. John had opened the account on November 9, 1959, and had executed a signature card for the account on the same date. *Id.* At the time the account was opened, the bank's records contained no

reference to the account being payable on death to Lee. *Id.* at 216-17. Following John's death in 1974, the bank "refused to turn over the assets [to John's estate], because of an entry on the signature card which recited 'POD to Lee J. Bruckner.'" *Id.* at 217. The same entry appeared on the second of three pages of the bank's ledger card for John's account. *Id.*

¶31 The evidence at trial showed that no bank employee had any recollection of when the POD entries were made on the signature and ledger cards. *Id.* In addition, there was "no evidence" that John had "ever requested or applied for a POD account." *Id.* at 218. On this record, our supreme court concluded that the POD entries on the signature and ledger cards were not competent evidence of John's intent. *Id.* at 222-23. The court reasoned that because there was no evidence that the entries were made at John's request, there were no grounds to conclude that the entries were an expression of John's intent "and not that of a third person." *Id.* at 222.

¶32 The Estate argues that, under ***Bruckner***, a "bank-generated record," standing alone, is insufficient to provide competent evidence that an account owner intended to create a POD account or designate a particular POD beneficiary. Here, however, we do not rely on Ally's internal records alone as evidence that Martin intended his checking and savings accounts to be POD accounts with Taps as the sole beneficiary. We also rely on Martin's own confirmation during the January 12, 2019 phone call that he wanted Taps to receive the funds from the checking and savings accounts following his death. Unlike the circumstances in ***Bruckner***, the January 12 phone call provides evidence to support a conclusion that the entries in Ally's records were an expression of Martin's intent "and not that of a third person." *See id.*

¶33     We therefore reverse that portion of the circuit court's judgment ordering that the funds from Martin's checking and savings accounts be remitted to the Estate.  We remand for the court to determine the amount of money to which Taps is entitled and to award that amount to Taps.

### III.  Martin's CD accounts

¶34     We next consider whether the circuit court properly determined that the funds from Martin's CD accounts should be remitted to the Estate.  In addressing this issue, we assume, without deciding, that governing instruments controlled the disposition of the funds in Martin's CD accounts.  We nevertheless affirm the court's decision with respect to the CD accounts because we agree that there is no competent evidence of Martin's intent regarding the beneficiary designations for those accounts.

¶35     As noted above, it is undisputed that Martin owned 333 CDs at Ally at the time of his death.  It is further undisputed that, at the time of Martin's death, Ally's internal records listed Taps as the sole POD beneficiary for 228 of the CDs and listed Taps, Adrienne, Steven, Karen, Tayla, and Ari as co-beneficiaries for the remaining 105 CDs.  Taps argues that these internal records provide competent evidence of Martin's intent regarding the beneficiary designations for his various CD accounts.  Like the circuit court, however, we conclude that other evidence raises questions regarding Martin's intent.

¶36     During the evidentiary hearing, Taps introduced Exhibit 26, which purports to be a series of notes made by Ally employees regarding telephone calls with Martin about his accounts.  According to Exhibit 26, Martin called Ally on January 8, 2019, and asked to open 450 fourteen-month CDs, each in the amount of $1,000.  Martin asked Ally to provide a single welcome kit for all of these

accounts and asked that "beneficiaries [be] assigned to his profile as a whole and not the accounts individually" in the following amounts: "*Mary $240K* *Adrian $100K*[5] *Karen $100K* *Steven $30K*."  Ally denied both of these requests, noting that Martin would receive individual welcome kits for each account and that beneficiaries "need to be assigned to each account."  Ally advised Martin that "someone will reach out to him by EOD to confirm whether we can open that many accounts."

¶37    Martin apparently called Ally again on January 9, 2019, asking to "remove Steven's name from his list of requested beneficiaries, and replace it with two names, [Tayla] and Ari, each of who would receive 30k."  The agent noted, "Confirmed with customer that I would update request, but no promises were made."

¶38    Exhibit 26 shows another call between Martin and Ally on January 10, 2019.  The agent's note states: "[C]ustomer wanted to finish opening the … 450 select cd.  [C]ustomer advise that previous agent that started with the 217 account[s] got sup approval to open all of them but call disconnect when phone died."  Martin again requested to receive only one welcome kit for all of the accounts, and the agent told Martin that only one welcome kit would be sent.  The January 10 note ends with the statement: "Pass call back to agent to complete other account openings."

¶39    Exhibit 26 reflects that another phone call occurred, apparently on either January 10 or 12, 2019, during which Martin "started asking about welcome

---

[5]  This presumably referred to Martin's daughter Adrienne.

14

kits again" and then stated he wanted all of the CDs listed on one sheet of paper. The agent advised that written approval would be required for that request, and Martin responded that he wanted to close all of his CDs if the request could not be approved. The agent then "suggested that we stop opening accounts until he gets that approval or he could end up on the phone for a long while just to close accounts." Exhibit 26 shows that, at the time of this phone call, 107 CDs had already been opened.

¶40 Exhibit 26 shows that at least three additional phone calls took place on January 12, 2019. The agent's notes from the first of those calls state:

> [O]pen 450 Select cds - customer is requesting to close all his NPCD wants to open 450 x 1000 each 14m CD. He wants 230 x 1000 cd beneficiary Mary Tap there is 10 left for Mary, 100x 1000 for Karen, 100 x 1000 for Adrienne, 10x 1000 for [Tayla], and 10 x 1000 for [Ari]. [T]hat makes 450. [T]here 217 left to do.

¶41 Ally provided a recording of the first two hours of this January 12, 2019 phone call, and the record also contains a transcript of that recording. Although Ally's system recorded two hours of this call, it is undisputed that the call actually lasted longer than two hours. The transcript shows that during the recorded portion of the call, Martin initially stated that he wanted to close his existing CD accounts and "take all [his] assets and put it into individual $1,000 CDs," leaving $10,000 in his savings account. In response to that request, an Ally representative, "Kat," closed Martin's existing CD accounts and transferred the funds from those accounts into his checking account for the purpose of purchasing the new CDs.

¶42 Kat then informed Martin that he had $457,748.04 in his checking account, which would allow him to purchase 457 $1,000 CDs. Martin responded

that Kat should "make it 460." Kat told Martin that, in order to do that, she would need to transfer $2,251.96 from his savings account into his checking account, which would leave only $7,748.04 in his savings account. Martin indicated that he wanted to leave more than $7,748.04 in his savings account, and Kat then suggested opening only 450 $1,000 CDs, instead of 460. After further discussion, Martin agreed with that suggestion.

¶43 Kat then asked Martin about the beneficiaries for the new CDs. Martin initially stated that he wanted $240,000 to go to Taps, $100,000 to go to Adrienne, and $100,000 to go to Karen. Because those amounts added up to $440,000, Kat told Martin that he had $10,000 left in CDs for which he needed to designate a beneficiary. Martin expressed confusion as to whether the amounts that he and Kat had been discussing included his checking and savings accounts, and Kat clarified that Martin had a total of $467,748.04 at Ally, including the funds in his checking and savings accounts. Martin responded:

> Okay. Why don't we make it 450—let's see, 460. I'm trying to break it up. I wanted to put, so 467, so 240—why don't we make it 230—230, 100, 100, so that's 430, 530, 630, 630, and 15 and 15 for the last two. If I have 230, 100, 100, that's 430.

¶44 Kat informed Martin that this would leave $20,000 in CDs for which he needed to designate a beneficiary. Martin replied, "Okay. So make it 10 and 10 for [Tayla] and Ari, 10 for [Tayla] and 10 for Ari." Kat responded, "Okay. So, now, we're going to do 450 at 1,000, and so Mary's going to have 230 of it. Your two daughters are going to have 100,000 apiece, and then Ari and [Tayla are] going to have 10,000." Martin indicated that was correct.

¶45 Kat subsequently put Martin on hold multiple times while she worked to open the requested CDs. Near the end of the recorded portion of the

call, Kat told Martin that she had opened eighteen $1,000 CDs and was working to complete the rest. As noted above, at least two additional phone calls occurred between Martin and Ally representatives on January 12. The appellate record does not contain recordings of those calls.

¶46 The parties agree that, ultimately, only 338 CDs were opened in Martin's name on January 12, 2019, rather than 450. It is further undisputed that, according to Martin's February 5 bank statement, 233 of the CDs were set up as POD accounts and 105 were "in trust for" (ITF) beneficiary accounts. As of February 5, Martin still had $129,319.25 in his Ally savings account. On February 12, Martin made four separate transfers of $25,000 from his Ally savings account to Synchrony Bank. On April 19, Martin called Ally and asked to change his 105 ITF CDs to POD CDs. Ally implemented that request on May 2. In November 2019, Martin closed five of his Ally CDs that listed Taps as the sole beneficiary.

¶47 The circuit court stated in its written decision that the "best competent evidence of [Martin's] intent at the time the accounts were created would have been the transcript of the recording from the January 12, 2019 phone call," but "[u]nfortunately, the recording is not of the entire call." The court noted that the transcript of the call did not "reflect, in [its] entirety, the accounts that were ultimately established as a result of the call. The recording does not reflect, in [its] entirety, the beneficiaries that were ultimately named on the accounts established." The court found that while there were some consistencies between Martin's instructions during the January 12 call and the ultimate beneficiary designations shown in Ally's internal records, there were also inconsistencies. The court also noted that the parties agreed that additional phone calls had taken place, but those phone calls were not recorded.

¶48 Next, the circuit court found that Martin "change[d] his mind multiple times as to what he want[ed] to do" during the recorded January 12 call. The court then reiterated that the beneficiaries ultimately listed in Ally's records did not "coincide" with Martin's instructions during the recorded portion of the January 12 call. The court explained:

> The [call] reflects that [Martin's] son, [Steven], is not a beneficiary. In fact, he ultimately was named as a beneficiary. The [call] indicates that Mary Taps would not be listed on 105 [CDs] created. In fact, she [ultimately] was named with the other 5 beneficiaries. The [call] indicates an intention that each of [Martin's] two daughters would receive $100,000. This was not the end result. The [call] indicates an intention to have his 2 grandchildren receive $10,000 each. This was not the end result.

Given these inconsistencies between the January 12 call and the beneficiary designations shown in Ally's internal records, the court stated it was "impossible" for the court to find "that any competent evidence exists to determine [Martin's] true intent at the time that the accounts were established as required under [WIS. STAT. §] 705.02(3)."

¶49 None of the circuit court's factual findings are clearly erroneous, as they pertain to Martin's CD accounts. *See* WIS. STAT. § 805.17(2). In particular, the court's finding that the recorded portion of the January 12 call is inconsistent with the beneficiary designations for the CD accounts shown in Ally's internal records is not against the great weight and clear preponderance of the evidence. *See **Phelps***, 319 Wis. 2d 1, ¶39. The record also supports the court's finding that Martin changed his mind multiple times during the January 12 call regarding the beneficiary designations for his CD accounts. Furthermore, the court correctly noted that the parties agreed there were additional phone calls between Martin and Ally on January 12, which were not recorded. Those phone calls could have shed

18

light on Martin's intentions with respect to the beneficiary designations for the CD accounts; however, without knowing the contents of those calls, we have no way of knowing whether they support the beneficiary designations for the CD accounts that were shown in Ally's internal records at the time of Martin's death. On this record, we agree with the circuit court that there was no "competent evidence" of Martin's intent regarding the beneficiary designations for the CD accounts.

¶50 Taps argues that Ally's Exhibits 1, 2, and 25—which were compiled from Ally's internal records—are competent evidence of Martin's intent regarding the beneficiary designations for the CD accounts. According to Taps, those exhibits "clearly show[]" that Taps was the sole beneficiary of 228 CD accounts at the time of Martin's death and was a co-beneficiary of the remaining 105 CD accounts. As discussed above, however, a bank's internal records, without more, are insufficient to provide competent evidence regarding a depositor's intent. *See Bruckner*, 81 Wis. 2d at 222-23. For Martin's checking and savings accounts, there was additional evidence of Martin's intent—namely, Martin's confirmation during the January 12 phone call that Taps was to receive the funds from the checking and savings accounts following his death. There is no similar corroborating evidence of Martin's intent regarding the beneficiaries for the CD accounts. To the contrary, as explained above, Martin's expressed intentions during the January 12 phone are inconsistent with the ultimate beneficiary designations for the CD accounts shown in Ally's records.

¶51 Taps also argues that the parties' stipulation that Ally distributed the funds from Martin's accounts in accordance with its internal records "is competent evidence that Martin intended for [Taps] to be beneficiary of his accounts." We disagree. The fact that Ally distributed the funds in accordance with its internal records does not prove that Ally's internal records accurately reflected Martin's

intent regarding the beneficiary designations for the CD accounts. The Estate stipulated to the former proposition only; it did not stipulate to the latter.

¶52     Taps next argues that the recorded portion of the January 12 phone call clearly shows that Martin "wanted [Taps] to be beneficiary of 230 CDs, the savings account and the checking account." Taps argues, "Although the transcript of the January 12 phone call does not match the internal records of [Ally] as it pertains to the children's and grandchildren's distributions, it is nevertheless evidence of [Martin's] intent to make [Taps] a beneficiary of his accounts." We reject this argument because the inconsistencies between the January 12 call and Ally's internal records are not limited to the beneficiary statuses of Martin's children and grandchildren. The January 12 call and Ally's internal records are also inconsistent with respect to Taps as a beneficiary of the CDs, as Ally's internal records list Taps as a co-beneficiary of 105 of Martin's CDs, which is inconsistent with Martin's instructions during the January 12 call.

¶53     Finally, Taps argues that Martin's actions after the January 12 call confirm that he wanted Taps to receive "at least $230,000" from the CD accounts. In particular, Taps asserts that after Martin received his February 5, 2019 bank statement, he was clearly aware that he had a significant amount of money at Ally that had not been invested in CDs, given that he transferred $100,000 from Ally to Synchrony Bank on February 12. Taps also observes that, in April 2019, Martin asked to change 105 of his CDs—which listed Taps and his children and grandchildren as co-beneficiaries—from ITF accounts to POD accounts. Taps asserts: "Martin's transfer of $100,000 to Synchrony Bank and his request to change the ITF beneficiary accounts to POD beneficiary [accounts] show that Martin reviewed his bank statements and was aware that he had not set up 450 CD accounts as stated in the partial recording of the January 12 phone call."

According to Taps, these actions show that "there must have been a subsequent discussion between Martin and [Ally] in which he changed his designations of beneficiaries, as reflected in [Ally's] Exhibits 1, 2, and 25."

¶54     We agree with Taps that Martin's transfer of $100,000 from Ally to Synchrony Bank shows that Martin knew he had not purchased 450 $1,000 CDs from Ally.  We do not agree, however, that Martin's transfer of that money or his request to change certain CDs from ITF accounts to POD accounts shows Martin's intent regarding the *beneficiary designations* for his CD accounts.  Furthermore, any speculation about what Martin may have said during his unrecorded conversations with Ally representatives does not provide competent evidence of his intent, as required by WIS. STAT. § 705.02(3).  Notably, Lemma was the only Ally employee to testify at the evidentiary hearing.  No Ally employee who actually spoke to Martin on January 12—or at any other time—provided any testimony about Martin's intent with respect to the beneficiary designations for the CD accounts.

¶55     Ultimately, while Ally's internal records reflect certain beneficiary designations for the CD accounts, those designations conflict with Martin's statements during the recorded portion of the January 12 phone call.  Under these circumstances, we agree with the circuit court that there is no competent evidence of Martin's intent regarding the beneficiary designations for the CD accounts.  Accordingly, the court properly ordered that the disputed funds from the CD accounts be remitted to the Estate.  *See* WIS. STAT. § 854.07(3).

¶56     No costs are awarded to any party.

*By the Court.*—Judgment affirmed in part; reversed in part and cause remanded with directions.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.